[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14530
_____

D.C. Docket No. 7:12-cv-00153-HL

LINDA JEAN QUIGG, Ed.D.,

Plaintiff-Appellant,

versus

THOMAS COUNTY SCHOOL DISTRICT,
CHARLES EVANS,
Individually, et al,

Defendants-Appellees.

_____

Appeal from the United States District Court
For the Middle District of Georgia
_____

(February 22, 2016)

Before WILSON, WILLIAM PRYOR, and GILMAN,[*] Circuit Judges.

WILSON, Circuit Judge:

---

[*] Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit Court of Appeals, sitting by designation.

Linda Quigg claims that the Thomas County School District (School District) and five individual members of the School District's governing board (School Board) discriminated and retaliated against her, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983, by refusing to renew her employment contract and filing an ethics complaint against her. The district court granted summary judgment to the School District and School Board members on all of Quigg's claims.

On appeal, Quigg argues, *inter alia*, that the district court erred because the summary judgment framework the court applied to her discrimination claims—the *McDonnell Douglas*[1] framework—is not the proper framework for evaluating mixed-motive claims that rely on circumstantial evidence. This threshold issue requires us to identify the appropriate summary judgment framework for analyzing such claims. We conclude that the proper framework for examining mixed-motive claims based on circumstantial evidence is the approach adopted by the Sixth Circuit in *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008)—not the *McDonnell Douglas* framework. Under the framework set forth in *White*, "to survive a defendant's motion for summary judgment, a . . . plaintiff asserting a

---

[1] *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). In *McDonnell Douglas*, the Supreme Court put forth a three-part test for evaluating single-motive employment discrimination claims: (1) the employee must show a prima facie case of discrimination; (2) the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action; and (3) the employee has to show the proffered reason is mere pretext. *See* at 802–05, 93 S. Ct. at 1824–26. This test is known as the *McDonnell Douglas* burden-shifting framework.

mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action.  *See* 533 F.3d at 400 (internal quotation marks omitted).

Applying the proper mixed-motive framework to Quigg's discrimination claims, we hold that the district court erred in granting summary judgment on her claims against the School District and School Board members Scott Morgan and Mark Nesmith.  However, we find that the court properly dismissed Quigg's remaining discrimination claims, as well as all of her retaliation claims.  Therefore, we affirm in part and reverse in part.

## I.  BACKGROUND

Quigg served as the Assistant Superintendent of the School District from 1998 to 2007.  In 2007, she became the Superintendent.  The School Board appoints superintendents through term contracts, which are subject to renewal. The School Board consists of seven members, and a majority vote is required to renew a superintendent's contract.  In appointing Quigg, the School Board granted her a three-year contract.  Then, in 2008, the School Board extended her contract by one year, providing for an expiration date in mid-2011.

In 2008, 2009, and 2010, the School Board rated Quigg's overall performance as satisfactory or above satisfactory on her annual performance

evaluations.  Nevertheless, Quigg had a tumultuous relationship with several School Board members during that time.  For example, Quigg openly supported opponents of School Board members Kay Streets and Charles Evans during the 2010 School Board election.  That same year, the School Board sent documents related to certain School District programs to the Georgia Professional Standards Commission (PSC) because various School Board members had ethical concerns about Quigg's administration of the programs.  Additionally, although Quigg received an overall satisfactory rating on her 2010 performance evaluation, multiple School Board members reported in their individual evaluations of Quigg that she did not meet expectations on a number of criteria.

Given that Quigg's superintendent contract was set to expire in mid-2011, the School Board agreed to meet in February 2011 for a renewal vote on the contract.  Prior to the vote, School Board members Morgan and Nesmith encouraged Quigg to reorganize her administration to provide for an assistant superintendent.  Morgan and Nesmith told Quigg that she needed a tough "hatchet man" to address school policy implementation—a "guy" she could send to individual schools to "handle" things.  Morgan and Nesmith recommended a specific male employee for the position, but Quigg suggested a female employee. In response, Morgan replied:  "We have no males in the school system?"  And, at another point during a conversation with Nesmith and Quigg about the assistant

4

superintendent position, Morgan stated to Quigg: "[W]hat about a guy in this position? . . . I'm just being honest about that, you know, a guy will—and I was just thinking from the standpoint of an offset." However, following these comments, Morgan named a female school employee as a possible candidate for the position.

In addition to his conversations with Morgan and Quigg, Nesmith spoke to a parent of a School District student prior to the renewal vote about the superintendent position and the vote. Referring to the position of superintendent, the proposed assistant superintendent position, or alternatively, the office of the superintendent more generally, Nesmith told the parent: "[I]t is time to put a man in there."

A couple months before the renewal vote, Quigg expressed uncertainty about the vote. In a December 2010 e-mail, she wrote that she was "having a time with [her] Board" and indicated that at least three School Board members were "not on [her] side." Quigg later clarified that, as of that time, she did not believe she had the support of Board members Streets, Evans, or Nancy Hiers.

At the beginning of the February 2011 renewal vote meeting, Quigg rejected Morgan's and Nesmith's assistant superintendent proposal. Instead, Quigg proposed a reorganization plan providing for various "directors" to oversee different aspects of her administration. The School Board then voted five-to-two

*against* renewing Quigg's contract.  School Board members Streets, Evans, Nesmith, Morgan, and Hiers voted against Quigg.  After the vote, Hiers told a School District employee that she voted against Quigg because Quigg "needed a strong male to work under her to handle problems, someone who could get tough."

A few months after the vote, Quigg filed a complaint with the Equal Employment Opportunity Commission (EEOC) against the School District, alleging sex discrimination and retaliation.  The following year—in February 2012—the School District lodged a complaint against Quigg with the PSC.  The complaint was partly based on the documents the School Board sent to the PSC in 2010.  The PSC found probable cause for the complaint and recommended suspension of Quigg's teaching license.

Thereafter, Quigg filed her Title VII and § 1983 discrimination and retaliation claims in district court.  Quigg raised a number of claims against the School District: (1) a Title VII and a § 1983 mixed-motive sex discrimination claim for refusing to renew her contract;[2] (2) a Title VII retaliation claim for refusing to renew her contract; and (3) a Title VII retaliation claim for filing the PSC ethics complaint against her.  In addition, Quigg brought a § 1983 mixed-motive sex discrimination claim against Streets, Evans, Morgan, Nesmith, and

---

[2] Quigg's discrimination claims are based on both sex and gender.  *See Glenn v. Brumby*, 663 F.3d 1312, 1316–17 (11th Cir. 2011) (concluding that sex discrimination under Title VII and § 1983 encompasses sex and gender-based discrimination).

6

Hiers based on their individual votes against renewing her contract.[3]

After the School District and School Board members moved for summary judgment, the court held that Quigg presented only circumstantial evidence of discrimination and, applying the *McDonnell Douglas* framework, concluded that no triable issues of discrimination exist. The court also found that Quigg's various retaliation claims were without merit. Accordingly, the court granted summary judgment to the School District and School Board members on all of Quigg's claims. This appeal followed.

## II.    STANDARD OF REVIEW

We review de novo a summary judgment determination, drawing "all reasonable inferences in the light most favorable to the non-moving party." *See Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011). Summary judgment may be granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2510 (1986) (quoting Fed. R. Civ. P. 56(c) (1985)). A genuine issue of material fact exists when "the evidence is

---

[3] Quigg also raised (1) a Title VII retaliation claim against the School Board members and (2) various Title VII and § 1983 single-motive discrimination claims. The district court rejected all of these claims. We briefly address these claims here, as they warrant minimal discussion on appeal. First, school board members cannot be sued in their individual capacity under Title VII. *See Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (per curiam). Thus, the district court properly dismissed Quigg's Title VII retaliation claim against the Board members. Second, Quigg has failed to establish a genuine issue of material fact with respect to her single-motive discrimination claims. As such, we affirm the court's dismissal of those claims.

7

such that a reasonable jury could return a verdict for the non[-]moving party." *Id.* at 248, 106 S. Ct. at 2510.  Summary judgment is only appropriate if a case is "so one-sided that one party must prevail as a matter of law." *See id.* at 251–52, 106 S. Ct. at 2512.

### III.    TITLE VII AND § 1983 DISCRIMINATION CLAIMS

We first address Quigg's Title VII and § 1983 mixed-motive sex discrimination claims against the School District and School Board members. "Title VII and [§] 1983 claims have the same elements where the claims are based on the same set of facts," and in such cases, the claims are subject to the same legal analysis.  *See Rioux v. City of Atlanta*, 520 F.3d 1269, 1275 n.5 (11th Cir. 2008) (using a legal framework developed in the Title VII context to evaluate a § 1983 claim); *Abel v. Dubberly*, 210 F.3d 1334, 1338 n.3 (11th Cir. 2000) (per curiam). Therefore, we will address Quigg's discrimination claims together.

Discrimination claims brought under Title VII and § 1983 are typically categorized as either mixed-motive or single-motive claims.[4]  An employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, "was a motivating factor for" an adverse employment action, "even though other factors also motivated" the action.  42 U.S.C. § 2000e–2(m);

---

[4] Mixed-motive and single-motive discrimination are different theories of discrimination, as opposed to distinct causes of action.  Specifically, they serve as alternative causation standards for proving discrimination. *Cf. Univ. of Texas Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S. Ct. 2517, 2530 (2013).  Nonetheless, for the sake of brevity, when discussing claims brought under these theories, we refer to them as mixed-motive and single-motive "claims."

*see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977) (finding that a plaintiff can meet her burden in a § 1983 case by showing a protected characteristic was a "motivating factor" in an adverse action). In contrast, single-motive claims—which are also known as "pretext" claims—require a showing that bias was the true reason for the adverse action. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 251–53, 101 S. Ct. 1089, 1092–93 (1981) (considering a single-motive, gender-based discrimination claim).

Single-motive and mixed-motive discrimination claims can be established with either direct or circumstantial evidence. *See Desert Palace*, *Inc. v. Costa*, 539 U.S. 90, 99–102, 123 S. Ct. 2148, 2154–55 (2003); *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004). Here, Quigg's claims are based on circumstantial evidence—the evidence "suggests, but does not prove, a discriminatory motive."[5] *See Wilson*, 376 F.3d at 1086.

Quigg asserts that the district court erred in dismissing her discrimination claims because: (1) the *McDonnell Douglas* framework is not the proper framework for evaluating mixed-motive claims that rely on circumstantial evidence; and (2) under the proper framework, she has established triable issues of discrimination with respect to all of the appellees. Quigg's threshold argument requires us to address a novel question in our circuit, as we have yet to identify the

---

[5] In comparison, direct evidence is evidence proving, without inference, that illegal reasons motivated an adverse employment action. *See Wilson*, 376 F.3d at 1086.

appropriate summary judgment framework for evaluating mixed-motive discrimination claims based on circumstantial evidence. We begin with this issue.

## A. The Proper Summary Judgment Framework for Evaluating Mixed-Motive Claims Based on Circumstantial Evidence

To resolve this novel issue, we proceed in three parts. First, we briefly discuss the legal developments that have led to the emergence of circumstantial evidence-based, mixed-motive claims in our circuit. Second, given that this court has primarily used the *McDonnell Douglas* framework in evaluating circumstantial evidence claims, we consider whether that framework is appropriate in the mixed-motive context. Finally, rejecting the use of that framework, we identify the proper approach—the mixed-motive framework identified in *White*.

### 1. Relevant Legal Developments

In *Price Waterhouse v. Hopkins*,[6] the Supreme Court held, for the first time, that an adverse employment action motivated by both legal and illegal reasons constitutes actionable discrimination under Title VII. In a concurring opinion, Justice O'Connor agreed that an employee can prove discrimination under a mixed-motive theory, but she concluded that the employee must offer direct evidence in support thereof. *See id.* at 276, 109 S. Ct. at 1804 (O'Connor, J., concurring).

---

[6] 490 U.S. 228, 109 S. Ct. 1775 (1989), *superseded by statute*, Civil Rights Act of 1991, Tit. I § 107(a), 105 Stat. 1075.

A few years after *Price Waterhouse*, Congress amended Title VII by passing 42 U.S.C. § 2000e–2(m).  Section 2000e–2(m) "responded to *Price Waterhouse* by setting forth standards applicable in mixed-motive cases."  *See Desert Palace*, 539 U.S. at 94, 123 S. Ct. at 2151 (internal quotation marks omitted).

In the years following the passage of § 2000e–2(m), our circuit and several of our sister circuits relied on Justice O'Connor's *Price Waterhouse* concurrence to hold that direct evidence is required to prove a mixed-motive claim under the section.  *See id.* at 95, 123 S. Ct. at 2152 (citing *Trotter v. Bd. of Trs. of Univ. of Ala.*, 91 F.3d 1449, 1453–1454 (11th Cir. 1996)).  In light of this "direct evidence" requirement, employees relying on circumstantial evidence of discrimination could not bring Title VII mixed-motive claims in our courts.  Likewise, because "Title VII and [§] 1983 claims have the same elements where the claims are based on the same set of facts," similar § 1983 claims were limited.  *See Rioux*, 520 F.3d at 1275 n.5; *but see Lee v. Russell Cty. Bd. of Educ.*, 684 F.2d 769, 774 (11th Cir. 1982) (suggesting that employees have always been able to prove "a[n] . . . unconstitutional motive . . . by either circumstantial or direct evidence" in the § 1983 context (emphasis added)).  Thus, post-*Price Waterhouse*, our court had no need to determine the appropriate summary judgment framework for these types of claims.  However, the Supreme Court's decision in *Desert Palace* departed from our post-*Price Waterhouse* precedents and changed the legal landscape for mixed-

11

motive claims in this circuit.

In *Desert Palace*, the Supreme Court rejected Justice O'Connor's *Price Waterhouse* "direct evidence" requirement and held that an employee can prove a mixed-motive case with direct *or* circumstantial evidence. *See Desert Palace*, 539 U.S. at 101–02, 123 S. Ct. at 2155. In doing so, the Court opened the door to claims like Quigg's. Yet, *Desert Palace* did not resolve the question of the appropriate summary judgment framework for such claims. *See id.* at 92, 123 S. Ct. at 2150 (solely considering whether circumstantial evidence is adequate to trigger a mixed-motive jury instruction). Hence, the Supreme Court has left this issue to the lower courts to resolve.

2. An Examination of *McDonnell Douglas*

Our court has primarily used the *McDonnell Douglas* framework to evaluate circumstantial evidence-based discrimination claims at summary judgment. *See*, *e.g.*, *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005) (per curiam) ("As [the plaintiff] attempts to prove discriminatory intent by circumstantial evidence, his claims are subject to the *McDonnell Douglas* methods of proof."). Given this reliance on the *McDonnell Douglas* framework and because the district court used that framework to evaluate Quigg's claims, we must first consider whether this approach resolves the question before us. It does not. *McDonnell Douglas* is inappropriate for evaluating mixed-motive claims because it

12

is overly burdensome when applied in the mixed-motive context.

In *McDonnell Douglas*, the employee brought a single-motive discrimination claim. *See* 411 U.S. at 801, 93 S. Ct. at 1824. In assessing this claim, the Supreme Court established a three-part burden-shifting framework for determining liability in discrimination cases. *Id.* at 802–05, 93 S. Ct. at 1824–26. Under that framework, the employee first must show a prima facie case of discrimination. *Id.* at 802, 93 S. Ct. at 1824. Then, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 802–03, 93 S. Ct. at 1824. Finally, the employee has to show that the proffered reason is mere pretext. *Id.* at 804, 93 S. Ct. at 1825.

This framework is fatally inconsistent with the mixed-motive theory of discrimination because the framework is predicated on proof of a single, "true reason" for an adverse action. *See Burdine*, 450 U.S. at 256, 101 S. Ct. at 1095. To meet *McDonnell Douglas*'s "pretext" requirement, an employee must prove that the "true reason" for an adverse action was illegal. *See id.*, 101 S. Ct. at 1095. In other words, an employee can only meet her burden under *McDonnell Douglas* by showing the employer's purported legitimate reasons "*never* motivated the employer in its employment decisions or because [the reasons] did not do so in a particular case." *See Price Waterhouse*, 490 U.S. at 270, 109 S. Ct. at 1801 (O'Connor, J., concurring). Thus, if an employee cannot rebut her employer's

13

proffered reasons for an adverse action but offers evidence demonstrating that the employer also relied on a forbidden consideration, she will not meet her burden. Yet, this is the exact type of employee that the mixed-motive theory of discrimination is designed to protect. *See id.* at 257–58, 109 S. Ct. at 1794–95 (plurality opinion). In light of this clear incongruity between the *McDonnell Douglas* framework and mixed-motive claims, it is improper to use that framework to evaluate such claims at summary judgment.[7]

The Sixth Circuit's decision in *White* lends support to this conclusion. In *White*, the Sixth Circuit likewise considered for the first time "the appropriate summary judgment framework to apply to mixed-motive claims." *See* 533 F.3d at 396. In undertaking this analysis, the court devoted significant attention to *McDonnell Douglas*. *See id.* at 400–02. The court concluded that the *McDonnell Douglas* approach is a single-motive framework—its burden-shifting steps are designed to narrow the possible reasons for an adverse employment action, with the goal of identifying whether discriminatory animus was "the ultimate reason" for the action. *See id.* at 400–01 (citing *Burdine*, 450 U.S. at 256, 101 S. Ct. at 1095). The court then found that "this elimination of possible legitimate reasons . . . is not needed when assessing whether trial is warranted in mixed-motive cases . . . . [because] a plaintiff can win [a mixed-motive case] simply by showing that the

---

[7] This holding does not affect our precedents regarding single-motive claims—it is clear that the *McDonnell Douglas* framework is appropriate in that context.

defendant's consideration of a protected characteristic was *a* motivating factor." *Id.* at 401 (internal quotation mark omitted).  Based on this finding, the court rejected the *McDonnell Douglas* approach and established the above-discussed mixed-motive framework.  *See id.* at 400–01.  Hence, the Sixth Circuit similarly determined that *McDonnell Douglas* is inappropriate in the mixed-motive context because it involves a more rigid analysis than is required for mixed-motive claims.

Our rejection of the *McDonnell Douglas* framework in this context is also supported by the majority of other circuits to consider the issue.  The Second, Third, Fifth, and Tenth Circuits have found that mixed-motive cases require an approach that deviates from the *McDonnell Douglas* framework.  *See Holcomb v. Iona Coll.*, 521 F.3d 130, 141–42 (2d Cir. 2008) (departing from the traditional *McDonnell Douglas* framework after holding that "a plaintiff who . . . claims that the employer acted with mixed motives is not *required* to prove that the employer's stated reason was a pretext"); *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) ("The *McDonnell Douglas* burden-shifting framework does not apply in a mixed-motive case in the way it does in a pretext case because the issue in a mixed-motive case is not whether discrimination played the dispositive role but merely whether it played a motivating part in an employment decision." (internal quotation marks omitted)); *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (adopting a "modified *McDonnell Douglas* approach" for mixed-motive

15

cases); *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224–26 (10th Cir. 2008) (finding that a framework derived from *Price Waterhouse*, rather than *McDonnell Douglas*, governs mixed-motive claims).

Furthermore, the Fourth, Seventh, Ninth, and D.C. Circuits do not require the use of the *McDonnell Douglas* framework in mixed-motive cases involving circumstantial evidence. *See*, *e.g.*, *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (allowing employees to survive a motion for summary judgment through the *McDonnell Douglas* framework or by simply showing a genuine issue of material fact exists as to whether an illegal reason was a motivating factor in an adverse action); *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 860–62 (7th Cir. 2007) (same); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (same); *Fogg v. Gonzales*, 492 F.3d 447, 451 & n.* (D.C. Cir. 2007) (same).[8]

In fact, the Eighth Circuit is alone in holding that, post-*Desert Palace*, the *McDonnell Douglas* approach must be applied in the present context. *See Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004); *but see id.* at 739–48 (Magnuson, J., concurring specially) (disagreeing with the majority that the "*McDonnell Douglas* paradigm" is appropriate for evaluating mixed-motive

---

[8] While declining to analyze the role of *McDonnell Douglas* post-*Desert Palace*, the First Circuit appears to have adopted a summary judgment approach similar to the Fourth, Seventh, Ninth, and D.C. Circuits' approaches. *See Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 45 & n.8 (1st Cir. 2009).

claims).

### 3. Identifying the Appropriate Framework

Given that *McDonnell Douglas* is not appropriate for examining mixed-motive claims at summary judgment, we adopt the framework put forth by the Sixth Circuit in *White*.[9]  That framework requires a court to ask only whether a plaintiff has offered "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action.  *See White*, 533 F.3d at 400 (internal quotation marks omitted).  In other words, the court must determine whether the "plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision."  *Id.* at 401 (quoting *Desert Palace*, 539 U.S. at 101, 123 S. Ct. at 2155).  This approach is consistent with the mixed-motive theory of discrimination and our case law.  Additionally, it is supported by precedents from a

---

[9] Title VII and § 1983 discrimination claims involving similar facts warrant the same evidentiary framework.  *See*, *e.g.*, *Vessels*, 408 F.3d at 767 (applying the *McDonnell Douglas* framework to Title VII and § 1983 claims).  Therefore, the mixed-motive framework that we adopt from *White* applies to both Title VII and § 1983 circumstantial evidence-based, mixed-motive claims.  However, this finding does not disturb our holding in *Harris v. Shelby County Board of Education*, 99 F.3d 1078 (11th Cir. 1996), regarding the application of the "same decision" defense to Title VII and § 1983 mixed-motive claims.  As discussed more below, in *Harris*, we held that the "same decision" defense does no more than allow an employer to avoid damages and certain forms of equitable relief in a Title VII case, but in the § 1983 context, the defense serves as a complete bar to liability.  *See id.* at 1084–85 & n.5.

17

number of other circuits.

First, the framework identified in *White* aligns with the mixed-motive theory of discrimination because it directly incorporates the "motivating factor" language used in *Price Waterhouse* and § 2000e–2(m) to describe mixed-motive claims.  *See* 42 U.S.C. § 2000e–2(m); *Price Waterhouse*, 490 U.S. 249, 109 S. Ct. at 1790 (plurality opinion).  It also does not call for the unnecessary burden-shifting required by *McDonnell Douglas*, nor does it suffer from *McDonnell Douglas*'s pitfall of demanding that employees prove pretext.

Second, the framework is consistent with our precedents setting forth the guiding legal standard for examining discrimination claims at the summary judgment stage of the case.  Although we primarily have relied on *McDonnell Douglas* when considering circumstantial evidence-based claims at summary judgment, we have held that *McDonnell Douglas* is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case."  *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  Rather, the crux of the analysis at the summary judgment stage is whether the plaintiff has offered sufficient evidence to establish a genuine issue of discrimination.  *See id.*  Accordingly, "the plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  *Id.*; *see also Hamilton v.*

18

*Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012).  The framework we adopt from *White* requires the same analysis emphasized in these precedents—a straightforward inquiry into whether the plaintiff has presented sufficient evidence of mixed-motive discrimination to establish a jury issue.

Finally, a number of other circuits' approaches to circumstantial evidence-based mixed-motive claims support our adoption of the mixed-motive framework put forth in *White*.  In particular, the Fourth, Seventh, Ninth, and D.C. Circuits likewise require plaintiffs to show only that a genuine issue of material fact exists as to whether an illegal reason was a motivating factor in an adverse employment action.  *See*, *e.g.*, *Diamond*, 416 F.3d at 318; *Hossack*, 492 F.3d at 860–62; *McGinest*, 360 F.3d at 1122; *Fogg*, 492 F.3d at 451 & n.*.

Having identified the appropriate framework for considering the claims brought by Quigg, we turn to her Title VII and § 1983 claims against the School District and then to her § 1983 claims against the individual School Board members.

## B. **Title VII and § 1983 Claims Against the School District**

Quigg asserts the School District is liable for sex discrimination under Title VII and § 1983 because the School Board's decision not to renew her contract was based on her sex and gender.[10]  The School District responds that the Board's

---

[10] Because the School Board is the School District's governing body, "deliberate

19

decision not to renew Quigg's contract was solely based on legitimate, non-discriminatory reasons. The School District also argues that, even assuming a triable issue of mixed-motive discrimination exists, it is entitled to partial summary judgment on Quigg's § 1983 claims and complete summary judgment on her Title VII claims because the Board would have made the "same decision" regardless of her sex. We hold that (1) Quigg has demonstrated a genuine issue of material fact as to whether the School District discriminated against her, and (2) the School District's "same decision" defense fails at this stage. As such, Quigg's claims against the School District survive summary judgment.

1. Quigg Has Established a Triable Issue of Mixed-Motive Discrimination

We turn to the mixed-motive framework identified in *White* to resolve this issue. Given that the School District's refusal to renew Quigg's contract was clearly an adverse employment action, the only question before us is whether Quigg has presented sufficient evidence for a reasonable jury to conclude that her sex or gender was a motivating factor in the decision not to renew her contract. We conclude that she has met this burden. Various statements made by School Board members Nesmith, Morgan, and Hiers indicate that sex or gender-based bias was a motivating factor in their votes against her. Therefore, a jury could find that

indifference" analysis is not required here. *See Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404–07, 117 S. Ct. 1382, 1388–90 (1997) ("[P]roof that a [public entity's] legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the [public entity] acted culpably.").

20

illegal bias played a role in the Board's decision.

An employee challenging a decision made by a board can succeed on a mixed-motive claim if she demonstrates that "discriminatory input," such as sex or gender-based bias, factored into the board's "decisional process." *See Price Waterhouse*, 490 U.S. at 272, 109 S. Ct. at 1802 (O'Connor, J., concurring). Statements by the board's members or others involved with the board's decisional process that suggest bias can serve as evidence of discrimination. *See id.* at 251, 109 S. Ct. at 1791 (plurality opinion) (explaining that "stereotyped remarks can certainly be *evidence* that gender played a part" in an adverse employment action); *Vessels*, 408 F.3d at 771 (finding that statements indicating bias in favor of a racial group constituted circumstantial evidence of discrimination); *Maddow v. Procter & Gamble Co.*, 107 F.3d 846, 852 (11th Cir. 1997) (concluding that statements suggesting a preference for younger employees were circumstantial evidence of discrimination). However, "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision." *Price Waterhouse*, 490 U.S. at 251, 109 S. Ct. at 1791. When an employee raising a mixed-motive claim relies solely on remarks that indirectly evidence discrimination, the employee must show the circumstances surrounding the remarks create a genuine issue of material fact that the employer "actually relied on her [sex or] gender in making its decision." *See id.*, 109 S. Ct. at 1791.

21

Quigg offers the following statements by Nesmith, Morgan, and Hiers as evidence of discrimination: (1) Nesmith's statement to a school parent that "it is time to put a man in there"; (2) Morgan's and Nesmith's recommendation to Quigg that she hire a tough "hatchet man" to serve as assistant superintendent; (3) Morgan's statement to Quigg that she should consider a male assistant superintendent because it is important to achieve gender balance in the school administration; and (4) the comment by Hiers shortly after the renewal vote that she voted against Quigg because Quigg "needed a strong male to work under her to handle problems, someone who could get tough."

These statements indicate that Nesmith, Morgan, and Hiers preferred men— or, at the least, individuals with masculine characteristics—for positions within the office of the superintendent.  As such, the statements are circumstantial evidence of discrimination.[11]  *See Vessels*, 408 F.3d at 771; *Maddow*, 107 F.3d at 852.

---

[11] Quigg claims the statements rise to direct, not circumstantial, evidence of discrimination.  As noted above, direct evidence is evidence that "proves the existence of a fact without inference or presumption."  *Wilson*, 376 F.3d at 1086 (internal quotation marks omitted). "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination."  *Id.* (internal quotation marks omitted).  None of the statements meet this standard.  Although each statement indicates a desire for a male presence in the superintendent's office, the statements all require inference to reach the conclusion that the Board members voted against Quigg based on her sex or gender.  Nesmith's "it is time we put a man in there" statement is illustrative.  It is unclear whether this statement referred to the proposed assistant superintendent position, the office of the superintendent generally, or Quigg's position.  If the latter, the statement would clearly be direct evidence.  But, a presumption or inference is required to conclude the statement referred to Quigg's position, and if it referred to the proposed assistant superintendent position or the office of the superintendent generally, it only shows a desire to have a male presence in the office of the superintendent.  Such a desire does not necessarily lead to the conclusion that Nesmith

Moreover, a jury could find that the circumstances surrounding the statements prove this bias played a role in Nesmith's, Morgan's, and Hiers's votes against Quigg. The statements were far from stray remarks at the workplace based on sex stereotypes. *See Price Waterhouse*, 490 U.S. at 251, 109 S. Ct. at 1791. Rather, Nesmith, Morgan, and Hiers made the statements (1) during conversations about whether to renew Quigg's contract, (2) in relative temporal proximity to the vote, and (3) specifically referring to the composition of the office of the superintendent. Accordingly, "taken together and in the light most favorable to" Quigg, *see Mathews v. Crosby*, 480 F.3d 1265, 1275 (11th Cir. 2007), the statements establish a jury issue as to whether sex or gender-based bias was a motivating factor in the School Board's decision not to renew her contract.

## 2. The School District's "Same Decision" Defense Fails

The School District asserts that it has successfully raised an affirmative defense to Quigg's claims—the "same decision" defense. Section 2000e–5(g)(2)(B) of Title VII provides that if an employer can demonstrate it "would have taken the same action in the absence of the impermissible motivating factor, the court . . . shall not award damages" or certain equitable relief. 42 U.S.C. § 2000e–5(g)(2)(B). This defense is also available under § 1983; however, under §

---

wanted to remove Quigg—Nesmith may have wanted Quigg and a male to serve in the office of the superintendent together, with Quigg retaining her position. Thus, some presumption is required for the statement to be considered proof that Nesmith discriminated against Quigg based on her sex or gender.

1983 the defense serves as a complete bar to liability. *See Harris*, 99 F.3d at 1084 n.5. The School District argues it is entitled to partial summary judgment on Quigg's Title VII claim and complete summary judgment on her § 1983 claim because the School Board would have voted against renewing her contract regardless of any illegal bias.

Under Georgia law, if a majority of the School Board—four members—had voted in favor of renewing Quigg's contract, her contract would have been renewed. *See* O.C.G.A. § 20-2-57. Hence, for its "same decision" defense to succeed, the School District must show that Quigg would not have garnered four votes in favor of renewal even if illegal bias did not affect the Board's decision-making process. Given that two Board members voted in favor of renewal, if a triable issue exists as to whether two of the five members who voted against renewal would have voted differently but for illegal bias, then the School District's defense fails at this stage.

The School District claims it has presented evidence showing that all five Board members who voted against renewal—Streets, Evans, Hiers, Nesmith, and Morgan—would have done so regardless of Quigg's sex or gender. We agree with the School District with respect to Streets, Evans, and Hiers, but hold that a triable issue exists as to whether Nesmith and Morgan would have made the same decision absent bias.

24

The School District argues that Streets, Evans, and Hiers ultimately voted against renewing Quigg's contract because they personally clashed with Quigg and felt her performance was subpar.  The School District points to several pieces of evidence in support of this assertion.  Streets and Evans never made any comments suggesting illegal bias; their deposition testimony and performance evaluations of Quigg show that they felt her performance was inadequate; and their and Quigg's deposition testimony demonstrate ongoing personal animosity between them and Quigg, including tension resulting from Quigg's negative attitude towards them and her attempt to remove them from the School Board during the 2010 election.  Likewise, Hiers rated Quigg as "unacceptable" in several categories on her individual performance evaluation of Quigg in 2010 and testified that Quigg created a toxic atmosphere in the school system.  Most importantly, Quigg admitted that, as of December 2010, Streets, Evans, and Hiers were "not on [her] side."

When this evidence is combined, no genuine issue exists as to whether Hiers, Streets, and Evans would have made the same decision absent illegal bias.  Quigg's admission a few months before the renewal vote that Streets, Evans, and Hiers were "not on [her] side" is compelling evidence that issues unrelated to Quigg's sex or gender dictated their votes.  The context surrounding this admission demonstrates that Quigg believed Streets, Evans, and Hiers did not support her

because of various personal and professional disagreements. Taken alone, Quigg's admission would not be enough to carry the School District's burden at summary judgment, but the other evidence showing Streets, Evans, and Hiers had dysfunctional relationships with Quigg and were unsatisfied with her performance confirms that their votes would have been the same regardless of Quigg's sex or gender. *See Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003) ("A 'same decision' defense can be sufficiently supported by evidence showing . . . the plaintiff's lack of qualifications . . . based on reprimands for poor performance[,] . . . a negative attitude, and communication difficulties.").

Regarding Nesmith and Morgan, we reach a different conclusion. According to the School District, Nesmith and Morgan would have voted against Quigg regardless of her sex or gender because she refused to adopt their reorganization plan. However, the only evidence the School District offers in direct support of this claim is self-serving testimony from Morgan and Nesmith. *See Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513 (holding that summary judgment on an issue is not appropriate where the issue implicates "[c]redibility determinations"). Furthermore, even assuming that the evidence supported the School District's argument, the argument fails on its own terms. Taking the evidence in the light most favorable to Quigg, a jury could conclude that the reorganization plan proposed by Morgan and Nesmith was motivated by sex or

26

gender-based bias given the plan's emphasis on a tough, "hatchet man" assistant superintendent. That is to say, a jury could find that a decision based on Quigg's rejection of the plan was tantamount to a decision based on sex or gender. Therefore, a showing that Nesmith and Morgan voted against Quigg because she rejected their plan would not provide sufficient evidentiary support that their decisions were made without regard to sex.

Because a jury could find that Nesmith and Morgan would have voted differently but for illegal bias, the School District's "same decision" defense fails at this stage. If Nesmith and Morgan had voted to renew Quigg's contract, Quigg would have obtained the four votes needed for renewal, and the School Board would have made a different decision. Thus, Quigg's Title VII and § 1983 claims against the School District survive summary judgment.

### C. <u>Section 1983 Claims Against School Board Members</u>

Quigg also contends that the district court erred in granting summary judgment on her individual § 1983 claims against Streets, Evans, Hiers, Morgan, and Nesmith. She asserts that Streets, Evans, Hiers, Morgan, and Nesmith each discriminated against her by voting against renewing her contract. In response, Streets, Evans, Hiers, Morgan, and Nesmith offer arguments similar to those that the School District relied on in addressing Quigg's discrimination claims against it.

We hold that summary judgment was proper as to Streets, Evans, and Hiers

27

but inappropriate for Morgan and Nesmith.  First, as previously discussed, the "same decision" defense serves as a complete bar to liability in the § 1983 context, *Harris*, 99 F.3d at 1084 n.5, and the evidence demonstrates that Streets, Evans, and Hiers would have voted against renewing Quigg's contract regardless of Quigg's sex or gender.  Second, as demonstrated by Nesmith's and Morgan's various statements suggesting sex and gender-based bias, a triable issue exists as to whether an illegal reason was a motivating factor in Nesmith's and Morgan's votes against renewal.  In addition, Nesmith and Morgan have failed to show that they are entitled to summary judgment under the "same decision" defense—their arguments on this point mirror the School District's unpersuasive arguments.

## IV.    TITLE VII RETALIATION CLAIMS

The district court properly granted summary judgment to the School District on both of Quigg's Title VII retaliation claims.  To prove retaliation, an employee must show that: (1) she engaged in protected activity, such as opposing an unlawful employment practice; (2) she suffered an adverse employment action; *and* (3) a causal connection exists between the activity and adverse action. *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000). Quigg's claims fail because neither presents a triable issue as to causation.

Quigg first argues that she rejected Nesmith's and Morgan's reorganization plan because she believed the plan was discriminatory and the School Board voted

28

against her in retaliation for this protected activity.  But, even taking the evidence in the light most favorable to Quigg, the Board could not have known that, in rejecting the plan, Quigg was undertaking protected activity.[12]  Quigg never communicated to the School District, the Board members, or any other relevant parties that she opposed the plan because she thought it was discriminatory.[13] Without any knowledge amongst the Board that Quigg engaged in protected activity, Quigg cannot show that the activity caused the adverse renewal vote.  *See Durley v. APAC, Inc.*, 236 F.3d 651, 658 (11th Cir. 2000).

Quigg next asserts that the School District engaged in retaliation by filing the PSC ethics complaint against her after she pursued an action with the EEOC. However, the School District raised concerns with the PSC about the subject matter of its complaint well before Quigg's EEOC filing, and the School District did not formally lodge the complaint until five months after Quigg's EEOC filing. Furthermore, the PSC found "probable cause" following its investigation of the complaint, showing that the School District had legitimate reasons for the complaint.  Based on this evidence, no triable issue of causation exists.  *See Drago*

---

[12] Because Quigg's claim fails for lack of causation, we do not address whether her rejection of the plan constituted protected activity.  We merely assume, for the sake of argument, that this action was protected activity.

[13] Quigg contends that, during a conversation with Nesmith and Morgan about the Board's vote, she informed them that she found the plan discriminatory by stating, "I'm constantly you know, looking at that and sometimes I am uncomfortable with something like that."  However, this comment was not in reference to the reorganization plan.  Indeed, throughout this and other conversations with Nesmith and Morgan, Quigg indicated that she disagreed with the plan simply because she did not feel she needed an assistant superintendent.

29

*v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (dismissing retaliation claim because the employer contemplated the action prior to the protected activity and the adverse action occurred more than three months after the protected activity).

## V.    CONCLUSION

In sum, we hold that the *McDonnell Douglas* framework is not applicable to mixed-motive discrimination claims based on circumstantial evidence; instead, the mixed-motive framework set forth in *White* is the appropriate framework for examining these claims.  Applying that framework to Quigg's discrimination claims, we conclude that the district court erred in dismissing her Title VII and § 1983 mixed-motive claims against the School District and her § 1983 mixed-motive claims against Morgan and Nesmith.  However, we hold that the court properly granted summary judgment on Quigg's § 1983 discrimination claims against Streets, Evans, and Hiers.  Finally, we affirm the district court's dismissal of all of Quigg's retaliation claims.  Thus, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART.**