**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-13609

Non-Argument Calendar

————————————

ROGER WILLIAMS,

*Plaintiff-Appellant,*

*versus*

UNIFIED GOVERNMENT OF ATHENS-CLARKE COUNTY
GA,

*Defendant-Appellee.*

————————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 3:23-cv-00092-CDL

————————————

Before LUCK, KIDD, and MARCUS, Circuit Judges.

PER CURIAM:

Roger Williams appeals the district court's order granting summary judgment to the Unified Government of Athens-Clarke

County, Georgia ("ACC") on his claim brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(m). Williams, who is black, was terminated from his job as a police officer with the ACC police department ("ACCPD") and sued, alleging race discrimination. On appeal, Officer Williams argues that the district court erred in determining that: (1) there was no triable issue as to whether racial bias from a higher-ranking officer was a motivating factor in his termination; and (2) the ACCPD's record of leniency to white police officers did not rise above the level of speculation to establish that his race was a motivating factor in his termination. After careful review, we affirm.

## I.

The undisputed facts, for purposes of summary judgment, are these. On October 17, 2021, Williams and two other officers responded to a domestic disturbance call. After an exchange with Liana Beam, the woman who answered the door, Williams decided to take her into custody. Beam resisted as Officer Williams took her out of the doorway and into the patrol car, and she hit her head several times, on the side of the house and on the ground. While Williams admitted on the scene that he had to "slam her" down twice, he later said he did not use significant force -- as he "guid[ed]" her down, the force with which she struck the pavement was caused by her momentum in pulling away from him. By the second time she hit the ground, Beam was unresponsive and Williams called for emergency medical services ("EMS"). EMS personnel checked Beam and cleared her to be taken into custody.

24-13609                Opinion of the Court                3

Pursuant to ACC policy, Officer Williams submitted a use of force report shortly after the October 17 incident.  The report slowly worked its way through the chain of command laid out in ACC policy.  When the report reached Deputy Chief Keith Kelley, it included a use of force memorandum from Williams's supervisor, Sgt. Caleb Emmett, comments from Lt. Jody Thompson, and a recommendation from Captain Derek Scott that an Office of Professional Standards ("OPS") investigation be ordered.[1]

---

[1] Relevant to Williams's claims on appeal, Lt. Thompson added these comments before sending the report up the chain to Captain Scott:

> 1 – There were little to no de-escalation techniques used with the victim to remove her from the doorway.  The victim was forcibly removed from the doorway after just a few seconds.  It is not uncommon for a victim to be uncooperative in the early stages of a domestic violence investigation especially when she is in sight of the offender.  The trainee did attempt to speak with the victim, but more verbal techniques were needed.

> 2 – The level of force used to remove her from the doorway only further escalated the incident, which continued to spiral out of control from that point.

> 3 – Once the female is removed from the doorway, no de-escalation techniques are utilized, only threat of violence, "stop or you are going to get slammed to the ground."  Once she is away from the offender's view, that is when these techniques should be used to explain the response and determine if a crime has occurred (which has not been determined at this point).  After the handcuffs are applied, the victim is forced to the ground at which time she hits her head.

In OPS Sgt. Paul Davidson's investigation, he examined the body camera footage, reviewed the incident report and comments, visited the scene, and interviewed ACCPD and civilian witnesses. Davidson found that in two of Williams's incidents with Beam that day, his use of force was objectively reasonable, but that he used more force than was objectively reasonable to control her the two times he forced her to the asphalt. Davidson also found that Williams violated ACC policy by failing to use verbal de-escalation techniques to prevent or limit the force needed to control her after her first fall, and that Williams violated ACC policy by failing to monitor and care for her safety when she was in his custody.

The decision of whether to discipline Officer Williams was up to Jerry Saulters, the interim police chief, subject to review by ACC's human resources department. Saulters reviewed Davidson's OPS investigation memorandum; watched the body camera footage "[p]robably 20 times"; went over the facts of the investigation with his six captains; sought feedback from the chief and assistant chief of the University of Georgia police department; and met with Williams and they watched the body camera footage

---

4 – When the victim is escorted to the vehicle, she attempts to pull away and slammed onto the asphalt. Once seated in the car, she is allowed to step out and the door closed. When the door is reopened, Officer Williams is left with a single-hand grip, which allowed the victim to pull away. Officer Williams appears to take her to the ground which results in the victim slamming her head into asphalt, rendering her unconscious. This is witnessed by neighbors in the area.

together.  When Saulters asked Williams if he would do anything differently, Williams stood by his actions and said no.  Chief Saulters then determined that Williams had violated ACC's use of force, de-escalation, and custody policies and that the appropriate discipline for these violations was termination.  On May 6, 2022, the human resources department sent Williams a letter of termination.

After Williams brought this lawsuit, alleging a single count of mixed-motive race discrimination under Title VII, and the parties engaged in discovery, ACC moved for summary judgment. The district court granted summary judgment in favor of ACC, concluding that Williams could not establish that his race was a motivating factor in his termination based on Lt. Thompson's input or based on evidence that he was treated less favorably than white officers who used force.

This timely appeal follows.

## II.

We review a district court's grant of summary judgment *de novo*, viewing the summary judgment record in the light most favorable to the non-moving party and drawing all reasonable inferences in favor of that party.  *Valley Drug Co. v. Geneva Pharms., Inc.*, 344 F.3d 1294, 1303 (11th Cir. 2003); *Stanley v. City of Sanford*, 83 F.4th 1333, 1337 (11th Cir. 2023).  Summary judgment is proper only when no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law.  *Signor v. Safeco Ins. Co. of Ill.*, 72 F.4th 1223, 1227 (11th Cir. 2023); Fed. R. Civ. P. 56(a).  "A mere  scintilla  of  evidence  supporting  the  nonmoving  party's

position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citation modified).

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Discrimination claims brought under Title VII may be pursued under two theories of discrimination: single-motive and mixed-motive. *McCreight v. Auburn-Bank*, 117 F.4th 1322, 1330 (11th Cir. 2024). Under a single-motive theory, an employee must prove that unlawful bias was "the true reason" for an adverse employment action. *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). Under a mixed-motive theory, he need only show that bias was "a motivating factor" for the adverse action, "even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m); *see McCreight*, 117 F.4th at 1333 ("Mixed-motive theories of discrimination invoke a lessened standard of causation, not a diminished standard of proof.").

To prove discrimination under Title VII, a plaintiff can rely on direct evidence, circumstantial evidence, or both. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023). Direct evidence, if believed, "proves the existence of a fact without inference or presumption." *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017) (citation modified). "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Fernandez v. Trees, Inc.*, 961 F.3d

1148, 1156 (11th Cir. 2020) (citation modified).  All Title VII claims -- single-motive and mixed-motive -- are decided according to the Rule 56 standard at summary judgment.  *McCreight*, 117 F.4th at 1333.  "And that standard asks whether the employee has offered enough circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  *Id*. (citation modified). "Bits and pieces" of evidence are not enough.  *Id*.

At the summary judgment stage, single-motive cases based on circumstantial evidence are usually evaluated under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Quigg*, 814 F.3d at 1237.  Under the *McDonnell Douglas* approach, the plaintiff bears an initial burden to make out a *prima facie* case of discrimination.  *Tynes*, 88 F.4th at 944.  If the plaintiff does so, the burden shifts to the employer to articulate a legitimate reason for the adverse action.  *Id*.  If the employer does so, the burden returns to the plaintiff to show that the employer's articulated justification is pretextual and the true reason for the adverse action was unlawful discrimination or retaliation.  *Id*.

Alternatively, an employee may succeed on a racial discrimination claim under a mixed-motive theory if, as we've noted, he can show that illegal bias was a motivating factor for an adverse employment action, even though other factors also motivated the action.  *Quigg*, 814 F.3d at 1235; *see* 42 U.S.C. § 2000e-2(m). Mixed-motive claims are not evaluated under *McDonnell Douglas*. *Quigg*, 814 F.3d at 1237.  Instead, courts must ask whether a plaintiff has offered evidence sufficient to convince a jury that: (1) the

defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was *a* motivating factor for the defendant's adverse employment action.  *Id*. at 1239.

In the Title VII context, a "convincing mosaic" of circumstantial evidence may survive summary judgment.  *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310–11 (11th Cir. 2023).  "But a 'convincing mosaic' is a metaphor, not a legal test and not a framework" for the summary judgment standard.  *Id*. at 1311.  An example of a "convincing mosaic" is evidence that demonstrates, *inter alia*, (1) suspicious timing, ambiguous statements, or other details from which discriminatory intent might be inferred, (2) "systematically better treatment of similarly situated employees," and (3) an employer's justification that is pretextual.  *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019).  If circumstantial evidence "raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

Under a mixed-motive theory, "a plaintiff need only show that a protected consideration contributed in some way to the outcome -- even if it ultimately changed nothing."  *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1339 (11th Cir. 2023).  An employee can succeed under a mixed-motive theory by presenting evidence showing that discriminatory input factored into the decisional process that resulted in the adverse employment action.  *Quigg*, 814 F.3d at 1241.  This can include evidence of discriminatory statements by those involved in the decisional process.  *Id*.  However,

"[w]hen an employee raising a mixed-motive claim relies solely on remarks that indirectly evidence discrimination, the employee must show the circumstances surrounding the remarks create a genuine issue of material fact that the employer" actually relied on his race in making its decision. *Id.* Additionally, we've held that "general evidence of discriminatory animus can create an inference that discrimination played a role in a particular case." *McCreight*, 117 F.4th at 1334. "But presenting sparse examples of an employer's animus toward a particular group is not enough on its own -- a plaintiff also needs evidence connecting that animus to the adverse employment action." *Id.*

To show that a protected characteristic was a motivating factor for an employer's decision, we apply "the traditional tort law standard of proximate cause." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 (11th Cir. 2013). One way a plaintiff can demonstrate proximate cause is to point to the discriminatory actions of a lower-level employee that influenced the decisionmaker. *Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1298 (11th Cir. 2021). This so-called "cat's paw" theory "provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation" of an employee rather than "independently" reaching the same decision. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). We've noted that when an employer makes an effort to independently investigate before making an adverse employment decision, it should not be held liable for another employee's hidden discriminatory motives. *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1250 (11th Cir. 1998). Also, the plaintiff

must show that the biased non-decisionmaker manipulated the decisionmaker into terminating him. *Wright v. Southland Corp.*, 187 F.3d 1287, 1304 n.20 (11th Cir. 1999). It is not enough to show that the decisionmaker considered *accurate* information from the biased non-decisionmaker. *See id.*

In *Jenkins v. Nell*, William Jenkins, a white crane operator, sued his employer for race discrimination after his Black supervisor terminated him. 26 F.4th 1243, 1246 (11th Cir. 2022). There, we concluded that even though the plaintiff failed to make out a *prima facie* case under *McDonnell Douglas* for lack of comparators, he had successfully presented a convincing mosaic of race discrimination. *Id.* at 1249–51. The record evidence in *Jenkins* supported a reasonable inference that the supervisor engaged in racist behavior toward him and other white employees, and that a genuine issue of fact existed as to whether he was fired because of his race. *Id.* In particular, Jenkins had substantiated testimony from other employees regarding racial comments against white employees, evidence of mistreatment of white employees, and the termination of white employees for engaging in behavior that Black employees also exhibited without reprimand. *Id.* Furthermore, the supervisor was the ultimate decision-maker who terminated Jenkins, and there was an otherwise inexplicable exodus of at least 18 white employees under his management. *Id.* at 1249, 1251.

### III.

Here, the district court did not err in granting summary judgment to the ACC on Officer Williams's racial discrimination

claim.  For starters, the parties agree that the ACC took an adverse employment action against Williams when it terminated him, so the relevant question is whether the district court properly determined that a protected characteristic, Williams's race, was not a motivating factor for the adverse employment action.  *Quigg*, 814 F.3d at 1239.  To establish discrimination under Title VII to withstand summary judgment, Williams needed to provide enough circumstantial evidence to create a triable issue about the ACC's discriminatory intent. *See McCreight*, 117 F.4th at 1333. The district court correctly determined that Williams failed to do so.

Officer Williams first attempts to impute alleged racial bias through the cat's paw theory from Lt. Thompson to the ACC.  Williams bases his claims of Thompson's bias on an ACCPD investigation report that cleared Thompson following a complaint that he had made racially offensive comments in the workplace.  Williams concedes that Thompson was not the formal decisionmaker in his termination, but Williams nonetheless insists that Thompson's comments on the incident report were the driving force behind the investigation and Williams's eventual termination.

However, we see no genuine dispute of fact suggesting that the decisionmaker -- Chief Saulters -- was manipulated in this instance. *Wright*, 187 F.3d at 1304 n.20.  Indeed, even if Deputy Chief Kelley testified that he relied on Thompson's comments along with the body-camera footage, and even if Chief Saulters testified that a lieutenant's evaluation is "significant," the multi-tiered decisionmaking process demonstrated that each supervisor in the chain of

command independently investigated the underlying facts. It is undisputed that the individual who fired Williams, Chief Saulters, conducted his own investigation and, if anything, relied on the recommendation of Sgt. Davidson, not Lt. Thompson. Because Saulters's decision to terminate Officer Williams was independent of Thompson, Williams cannot use the cat's paw theory of liability to help him establish causation. *Stimpson*, 186 F.3d at 1332. As a result, there is no evidence showing that Thompson's alleged discriminatory input factored into the decisional process that resulted in Williams's termination. *Quigg*, 814 F.3d at 1241.[2]

Moreover, we cannot say that Lt. Thompson's comments, listing four potential policy violations, tainted Chief Saulters's decision to terminate Officer Williams -- even if, for example, the comments did not mention Beam's "belligerence" during the incident. *Wright*, 187 F.3d at 1304 n.20. Notably, five supervisors conducted reviews after Thompson, and while his narrative was attached to the report, each supervisor conducted his own investigation. Once the investigation landed on Chief Saulters's desk, he reviewed the entire file and video multiple times before concluding that there were policy violations and made the decision, on his

---

[2] In *Jenkins*, the case on which Williams relies, the plaintiff could directly attribute the alleged racist comments that others corroborated to the undisputed sole decision-maker who terminated him. 26 F.4th at 1249–51. In this case, however, even crediting Williams's claim that Lt. Thompson made racist comments, and accepting his description of those comments as accurate, Williams did not tie Thompson's alleged comments to the ultimate decision-maker, Chief Saulters, in any way.

own, to terminate Williams. Thus, the circumstances surrounding Thompson's alleged remarks that were investigated by human resources do not create a genuine issue of material fact that Chief Saulters actually relied on Williams's race in making the decision to terminate him. *Quigg*, 814 F.3d at 1241.

Nor has Officer Williams presented enough circumstantial evidence based on the statistical data he introduced that would allow a jury to infer that race was a motivating factor in his termination. *McCreight*, 117 F.4th at 1333; *Quigg*, 814 F.3d at 1235. The crux of his argument is that the ACCPD had a "disproportionately lenient standard" to protect white officers who engaged in use of force incidents that did not extend to Black officers. Viewing the evidence in the light most favorable to Williams, we recognize that there was some evidence suggesting a lack of termination for use of force incidents in the ACCPD. *Stanley*, 84 F.4th at 1137. However, there was no evidence at all, other than Williams's conclusory assertions, to show that this lenience *only* extended to white officers, or even that any other officer violated the use of force policy. *See Lewis*, 934 F.3d at 1185.

In fact, Chief Saulters testified that Officer Williams was the first officer in five years to be investigated by the OPS for use of force policy violations. Williams relies on deposition testimony about one officer who tasered a suspect on concrete pavement, but that officer's conduct was found to be objectively reasonable and within the ACCPD policies. Without more, Williams's unsubstantiated assertions that the ACCPD had a custom of failing to

terminate white officers for use of force incidents does not create a genuine question for the jury as to whether his termination was racially motivated. *Quigg*, 814 F.3d at 1235; *McCreight*, 117 F.4th at 1333.  Accordingly, Officer Williams failed to provide sufficient evidence that his race was a motivating factor in his termination to support a race discrimination claim under the mixed-motive theory.

**AFFIRMED.**