[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15620
Non-Argument Calendar
_____

D.C. Docket No. 3:15-cv-00701-BJD-JRK

KIRBY MOHAMMED,

Plaintiff - Appellant,

versus

JACKSONVILLE HOSPITALISTS, P.A.,
a Florida Profit Corporation,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 18, 2017)

Before HULL, JORDAN, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Plaintiff Kirby Mohammed ("Plaintiff") appeals the grant of summary judgment on her pregnancy discrimination claims under Title VII and the Florida Civil Rights Act in favor of her former employer, Defendant Jacksonville Hospitalists, P.A. ("Defendant").  Concluding that Plaintiff has not shown that the reasons Defendant has given for her termination are pretextual, we affirm.

## I.     BACKGROUND

### A.     Factual Background

Plaintiff is a licensed practical nurse, which qualifies her to provide medical care and medication and to work in a hospital, nursing home, or doctor's office. Prior to beginning her employment with Defendant, Plaintiff had worked as a nurse at several short and long-term rehabilitation facilities and as a traveling nurse performing home-health care nursing services.  Plaintiff only did clinical work during this time, and did not perform any administrative or marketing tasks.

Defendant is owned by three physicians—Dr. Shawn Chopra, Dr. Mark Blatt, and Dr. Kevin Crismond—who comprise the company's board.  The practice administrator, Drew Snyder, oversees the office staff and human resources issues, and though he attends board meetings with the three doctors and provides input, his role is limited to implementing what the board decides.  Doctors who work for the company do not care for patients in their own facility, but rather care for patients in hospitals, nursing homes, hospices, and long-term care facilities.  This

2

system allows for the doctors to remain in a patient's continuum of care as he is moved among facilities.

While they were both working at the same facility, Dr. Chopra initiated discussions with Plaintiff about her working for Defendant as a "nurse liaison." According to Plaintiff, Dr. Chopra described the position as one that involved working closely with doctors and visiting different hospitals and facilities to promote the company's services in order to gain clientele, essentially becoming the "face" of the company. Dr. Chopra told Plaintiff that the position was being developed, and he would discuss hiring her with his colleagues. Plaintiff expressed interest in the position if it was something that she could "grow with."

Dr. Chopra raised the possibility of Plaintiff taking on this role in a board meeting, where it was discussed that the role would be to serve as an intermediary between the doctors and the facilities they visit, as well as the ones that they did not visit, to strengthen and develop relationships because the doctors did not have the time to do so themselves. Dr. Chopra testified that the board wanted the nurse liaison to visit facilities "independently and be mobile," and that the outcome of the nurse liaison's efforts would be "the development of relationships and the improvement of business." Dr. Chopra acknowledged that because the position was newly created, there would be a learning curve for both Plaintiff and the doctors, though Dr. Chopra nevertheless recommended Plaintiff as being a good fit

for the position.  Snyder testified that, at her interview, Plaintiff indicated that she understood the purpose of the position was to increase the number of facilities that Defendant's doctors visited, ensure that all of the patients requiring post-hospital care were discharged to facilities where Defendant's doctors visited, and to improve relationships with existing facilities.  Plaintiff testified that after her interview, she understood the position to involve meeting with doctors and case managers, as well as representatives of facilities where Defendant did not already have doctors in order to build that relationship.

Plaintiff was ultimately hired and began working for Defendant on July 16, 2014.  Plaintiff's offer letter indicated that there would be a 90-day probationary period, after which there would be a performance appraisal.  Plaintiff was not guaranteed a minimum of 90 days of employment, and Plaintiff understood that during this probationary period, she was an at-will employee.  She reported primarily to Drs. Chopra and Blatt.  There was no formal training for the position. Although the doctors provided Plaintiff with guidance, Dr. Chopra testified that the role was one that did not require training, but rather the initiative required to initiate contact with facilities and build relationships with them.

Plaintiff testified that she performed a significant amount of data entry during her first week of employment.  She requested a meeting with Drs. Chopra and Blatt to ensure that she would be able to do nurse liaison tasks, which she was

4

not doing consistently by the first week in August, when the meeting was held. While Plaintiff states that the doctors were "very complimentary," Dr. Chopra testified that they raised concerns about not seeing new facilities or an increase in business, and reiterated to Plaintiff that she needed to show initiative and work toward developing the business. After the meeting, Plaintiff's job description was updated to include daily meetings with the doctors and staff at the hospital, and she visited the other facilities that the doctors worked at more frequently.

Plaintiff testified that she could not visit existing facilities without an introduction first because the facility representatives would not know who she was, though she did call each facility every day to ensure the facilities were satisfied and Defendant's patients were properly cared for. Plaintiff also testified that she did visit new facilities on her own initiative when the opportunity arose, dropping off pens and cups at new facilities if she saw them while en route to dropping off prescriptions at various facilities, which was one of her job duties. Plaintiff testified to visiting seven to ten of these facilities during the course of her employment, though Dr. Blatt testified that he wanted five visits per week. Plaintiff also called facilities from a list of nursing rehab facilities in the area, sometimes "randomly," to introduce herself and the company. Plaintiff testified that she did not arrange any meetings with any facility other than those done at the

direction of the doctors, that she did not arrange any kind of promotional events, and she did not bring any new clients to Defendant.

At Dr. Chopra's request, Plaintiff arranged a meeting with Riverwood Rehabilitation, a facility that Defendant previously had a relationship with but that had been lost as a client because of poor communication. Dr. Chopra testified that Plaintiff was late for the meeting, brought the wrong refreshments, and was dressed inappropriately. Plaintiff denies that she was late and brought the wrong refreshments, but acknowledges that Dr. Chopra expressed his concerns regarding her attire. Drs. Chopra and Blatt both testified that the meeting was poorly organized and did not accomplish what it was supposed to.

Plaintiff also attended a meeting with Dr. Blatt at Lifecare of Jacksonville, which was also a facility whose relationship with Defendant had soured because of poor communication. Plaintiff acknowledged that she was late for this meeting. Dr. Blatt testified that Plaintiff was inappropriately dressed, and that the facility administrator was visibly put-off by Plaintiff's attire and conduct. From this incident, Dr. Blatt concluded that Plaintiff did not have the right mindset for her role. Dr. Blatt also noted incidents of Plaintiff's unprofessional behavior while at the hospital and interacting with hospital staff. Dr. Blatt recalled being frustrated with Plaintiff's job performance and informally counseling Plaintiff about improving, but did not document these interactions in writing.

6

Plaintiff, who initially learned that she was pregnant on August 7, 2014, found out on August 23, 2014, that she was having twins. Plaintiff informed Dr. Chopra of her pregnancy that same day. According to Plaintiff, Dr. Chopra responded by saying, "F**k. What are we going to do? This sucks. Are you going to be able to do your job?"[1] Despite Plaintiff's assurances that she could continue to perform her job, Dr. Chopra questioned whether she would be to continue to travel to facilities and get in and out of her car. When Dr. Blatt learned of Plaintiff's pregnancy from Dr. Chopra, Dr. Blatt said, "That means she's going to do a worse job." Dr. Blatt testified that he had concerns about Plaintiff's performance from "very early on," and that there were plans to fire her before she announced her pregnancy.

Plaintiff testified that she became insecure and worried about her job security after she informed Dr. Chopra of her pregnancy. Plaintiff claims that after her pregnancy announcement, Dr. Chopra did not respond as promptly to calls and text messages. Plaintiff notes that despite Dr. Blatt and Dr. Chopra assuring her that she was doing a good job and that her pregnancy would not affect her job security, the doctors were "definitely contemplating firing her." At least two other employees were pregnant during their time in Defendant's employ, but were not fired.

---

[1] Dr. Chopra claims that he did not swear, but rather congratulated her, told her that "children are a blessing," and sought to reassure her that her pregnancy would not affect her job.

On September 1, 2015, about nine days after Plaintiff announced her pregnancy and forty-five days after Plaintiff began working for Defendant, Snyder, along with Drs. Chopra and Blatt, met to determine whether to terminate Plaintiff. Dr. Chopra testified that the meeting focused on Plaintiff's failure to generate a "significant increase in the business" and "some issues with the facilities that we had interacted with her at," ultimately concluding that "our expectation wasn't met" and the nurse liaison position was not the solution to Defendant's problem. Dr. Chopra further noted that Defendant received leads on new clients from a colleague who had explained that generating such leads was simple, which prompted Dr. Chopra to conclude that they had hired the wrong person for Plaintiff's position. Generally, issues with Plaintiff's "attire, the inconsistency or the disorganization of the meetings, the lack of development of new business, and the fact that multiple office staff . . . said that they felt she wasn't doing anything" prompted the board to conclude unanimously that they should fire Plaintiff. The board members knew that Plaintiff was pregnant and expressed concern about the ramifications of firing a pregnant employee, but Snyder told the board that because they were eliminating the position and not firing Plaintiff because of her pregnancy, there should be no problem.

Plaintiff met with Snyder and Dr. Chopra on September 19, 2014. Dr. Chopra told Plaintiff that, although she had done a good job thus far, the practice

8

had decided to eliminate her position because her salary could not be justified, as the position was not producing the results that the doctors had expected it to.[2] Dr. Chopra offered to give Plaintiff a good reference. On a form provided to Defendant's payroll provider, the reasons indicated for Plaintiff's termination were "lack of work" and "position eliminated."

### B. Procedural History

Plaintiff filed a charge with the Equal Employment Opportunity Commission and received a right-to-sue letter on June 8, 2015. Plaintiff filed a civil complaint against Defendant on June 11, 2015, alleging that she was fired because of her pregnancy, and was therefore subjected to sex discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and the FCRA, Fla. Stat. § 760.01 *et seq.*[3] Defendant moved for summary judgment, which the district court granted, finding that Plaintiff had failed to rebut Defendant's reasons for terminating her as pretextual. Plaintiff timely appealed.

## II.   DISCUSSION

### A. Standard of Review

---

[2] Defendant notes that the board also ended the employment of a nurse practitioner who had been hired in anticipation of increased business.

[3] Plaintiff also asserted under the Americans with Disabilities Act and the FCRA that she was discriminated against because of her "perceived disability," though the district court granted summary judgment for Defendant on these claims. Plaintiff has not raised these claims again on appeal.

We review a district court's grant of summary judgment *de novo*, viewing all evidence and drawing all reasonable inferences in favor of the nonmoving party. *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1254 (11th Cir. 2012). Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Gate Gourmet*, 683 F.3d at 1254 (internal quotation marks omitted).

### B.    Whether Summary Judgment was Properly Granted

### 1.    Discrimination Claims under Title VII

Title VII prohibits employers from discriminating against an employee because of pregnancy, and a claim for pregnancy discrimination requires the same analysis as claims based on sex discrimination.[4] *Id.* at 1254–55. A plaintiff can show discrimination through circumstantial evidence, as Plaintiff attempts to do here. *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012).

In such cases, we typically apply the *McDonnell Douglas* burden-shifting framework. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, a plaintiff must establish a *prima facie* case of

---

[4] The Florida Civil Rights Act is modeled after Title VII, and so Plaintiff's claim under that statute is analyzed under the same framework and does not require separate discussion. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010); *Delva v. Cont'l Grp., Inc.*, 137 So. 3d 371, 375–76 (Fla. 2014) (holding that the FCRA prohibits pregnancy discrimination).

10

discrimination, which requires showing that "1) the plaintiff was a member of a protected class, 2) she was qualified to do the job, 3) she was subjected to an adverse employment action, and 4) similarly situated employees outside of the protected class were treated differently." *Id.* A plaintiff who successfully makes this showing "creates a presumption of discrimination," which requires the employer to then "articulate a legitimate, nondiscriminatory reason for its actions." *Id.* (internal quotation marks omitted). If the employer does so, the burden shifts back to the plaintiff, who must then show that the employer's proffered reasons are pretextual and not the real reason for the employment action, but that unlawful discrimination is. *Id.* A plaintiff must meet the given reasons "head on and rebut [them]" through showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's reasons. *Id.* at 1055–56 (internal quotation marks omitted). As this Court has noted, "if an employee cannot rebut her employer's proffered reasons for an adverse action but offers evidence demonstrating that the employer also relied on a forbidden consideration, she will not meet her burden" under the *McDonnell Douglas* framework. *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1238 (11th Cir. 2016).

Plaintiff argues that she has presented sufficient evidence to allow a reasonable jury to conclude that Defendant's stated reasons for her termination were pretexual. Plaintiff also argues that the district court did not construe the

11

evidence in the light most favorable to her.  Plaintiff contends that ultimately she presented a "convincing mosaic of circumstantial evidence" that would allow a jury to infer discrimination.[5]  Like the district court, we assume that Plaintiff has established a *prima facie* case of discrimination.

Defendant notes that Plaintiff was terminated because of her poor performance and the determination that her position did not generate the revenue expected to support it.  An employer's burden at this step is "exceedingly light," *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997), and the employer does not need to show that it was actually motivated by these reasons.  *Holland*, 677 F.3d at 1055.  We agree with the district court that Defendant has satisfied this burden.

### 2.    Whether Plaintiff Has Shown that Defendant's Reasons for Her Termination are Pretextual

Turning to the question of whether Plaintiff has sufficiently shown that Defendant's proffered reasons for her termination are pretexual, and that unlawful pregnancy discrimination was the real reason, we conclude she has not.

---

[5]  This Court has noted that the *McDonnell Douglas* framework is not the exclusive means to evaluate workplace discrimination under Title VII, and a plaintiff can survive summary judgment if she can show "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (footnote omitted) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).  Ultimately though, the plaintiff's required showing is the same: the plaintiff must show that the evidence, "when viewed as a whole, 'yields the reasonable inference that the employer engaged in the alleged discrimination.'" *Holland*, 677 F.3d at 1056 (quoting *Smith*, 644 F.3d at 1326).

In finding that Plaintiff had not demonstrated pretext, the district court noted that Plaintiff admitted to being "slow to start" the nurse liaison tasks, despite knowing that self-initiative was required in the position; that she did not consistently go to new facilities or set up meetings with contacts; that she was late to meetings; that she secured employment for her mother at a facility she visited while on the job; and that the doctors had concerns about Plaintiff's job performance "very early on" and met with Plaintiff before her pregnancy announcement to reiterate their expectations.

Plaintiff offers several arguments to show she was not actually fired for "poor job performance." Plaintiff argues that, to the extent she had any "slow start" in performing actual nurse liaison tasks, Defendant is to blame because she was initially assigned data entry tasks, and that it was she who took initiative to ensure she was no longer assigned tasks that were not nurse liaison tasks. Plaintiff also argues that if the doctors had any concerns "very early on" with her performance, she was never informed or told her job was in jeopardy, including at the early-August meeting. Plaintiff further argues that the "remedial" tasks she was performing when she was terminated were either part of her job description or were assigned by Snyder, who was not her supervisor, and so her doing remedial work instead of visiting facilities should not be counted against her. Indeed, Plaintiff argues that developing new business was only one of her duties, and that

13

the work that she did do in maintaining and strengthening existing relationships shows she did not in fact show poor job performance.  Finally, Plaintiff notes that she was never disciplined for any tardiness, attire, or performance issues.

Each of these reasons is a variation on a common theme:  that any blame for Plaintiff's "poor performance" rests on Defendant, not Plaintiff.  Notably, Plaintiff admits that she did not bring any new clients to the company, may have dressed unprofessionally on occasion, was late to a meeting with clients, and helped her mother get a position while on the clock for Defendant.  Even assuming that Defendant's doctors were ineffective in communicating with Plaintiff the expectations of her role and in helping her succeed in growing their business, Plaintiff has not refuted the fact that her supervisors viewed her job performance as poor, nor has Plaintiff shown that concern about her allegedly poor performance was merely a pretext, with discrimination being the real reason for her termination. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs . . . . The question is whether her employers were dissatisfied with her for . . . non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints . . . as cover for discriminating against her.").

Concerning Plaintiff's alleged failure to generate new business sufficient to fund the position created for that purpose, Plaintiff argues that Defendant did not

14

communicate any specific goals for the number of facilities she should be visiting or create any other metrics for measuring her performance. Plaintiff further argues that it was not until after she announced her pregnancy that the doctors suggested that her position should generate enough new business to be "self-supporting." Plaintiff also argues that the value of her non-marketing efforts was ignored, and the fact that the practice now needs to fill the nurse liaison position and has lost access to facilities since Plaintiff was fired refutes Defendant's proffered reason for her termination. Plaintiff also takes issue with the characterization of her job as primarily a marketing position and attempts to refute specific criticisms of her marketing efforts.

These arguments however, do not refute "head on," the fact that at the time of her termination, Defendant's doctors made a business decision that Plaintiff continuing to work in the nurse liaison position was not financially justified. Any mischaracterization of Plaintiff's efforts does not change the reality that she brought no new clients to Defendant, and securing new clients was the impetus for creating the position as well as the means by which Defendant was to earn the revenue to pay for the position. And there is no dispute that at least some portion of Plaintiff's job responsibilities included generating new business relationships. As with an employer's assessment of performance issues, the wisdom of an employer's business decision to terminate an employee or eliminate a position may

15

be faulted, but that decision itself cannot be unlawful so long as it is not actually based on discrimination. *Id.* at 1266. Here, Plaintiff has not met the standard for showing that the financial unviability of her position was just a pretext for the decision to terminate her, with her pregnancy being the true reason.

More generally, Plaintiff argues that the temporal proximity between her pregnancy announcement and her termination should give rise to an inference of discrimination. While temporal proximity may be evidence of pretext, such evidence alone is insufficient to survive summary judgment. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). In this case, any temporal proximity between Plaintiff's informing the doctors about her pregnancy and her termination does not directly rebut either of Defendant's given reasons for her termination. Similarly, Plaintiff's proffer of statements made by Drs. Chopra and Blatt upon learning of Plaintiff's pregnancy do not prove pretext. Plaintiff had demonstrated unsatisfactory job performance up to that point, and the company had questioned the financial viability of her job position, given her sub-par performance.

Nor does Plaintiff's argument that Defendant's failure to clearly and consistently articulate its reasons for Plaintiff's termination show pretext. Plaintiff argues that the "unsatisfactory work performance" justification for her termination was not put forth until after this lawsuit was filed, but even if this were true,

16

Plaintiff acknowledges that the stated reason for her termination at the time was that the practice could not justify paying her salary given the poor results she had shown. Plaintiff must rebut each of Defendant's stated reasons for termination before she can show pretext, and she has clearly failed to do so.

Finally, based on these shortcomings in Plaintiff's proof, we similarly conclude that Plaintiff has not otherwise shown a "convincing mosaic of circumstantial evidence" that allows the inference that she was intentionally discriminated against because of her pregnancy. Because Plaintiff has failed to rebut the non-discriminatory reasons for her termination, a jury cannot reasonably conclude from the facts here that her termination was based only on her pregnancy. *See Quigg*, 814 F.3d at 1238.

## III.    CONCLUSION

Plaintiff has not shown that Defendant's stated reasons for her termination were pretextual or that the evidence would otherwise allow a reasonable jury to infer that she was terminated because of her pregnancy, and so the district court's order granting summary judgment for Defendant is **AFFIRMED.**

17