[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-12463

Non-Argument Calendar

_____

MANIKA LEWIS,

Plaintiff-Appellant,

*versus*

SECRETARY OF THE U.S. AIR FORCE,

Defendant -Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

D.C. Docket No. 5:18-cv-00263-TKW-MJF

_____

Before JILL PRYOR, LUCK, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

Manika Lewis, a federal employee, appeals from the district court's grant of summary judgment against her in her employment discrimination suit against the United States Air Force alleging race discrimination, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e-16(a); age discrimination, pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 633a(a); and retaliation, pursuant to Title VII, 42 U.S.C. 2000e-16(a).  On appeal, Lewis claims that the district court erred for several reasons.  She argues that the district court erred in finding that she failed to establish a *prima facie* case for age and race discrimination because she proffered a comparator employee who was treated differently and because she established a "convincing mosaic" of discrimination.  She also asserts that the district court erred in finding that she did not show that her employer's justifications were pretextual.  And she argues that the district court erred when it found that an oral admonishment and a proposed reprimand were not actionable and that she failed to prove causation.  We address these arguments in turn.

I.

In 2002, Lewis, a Black female over the age of forty, was hired at Eglin Air Force Base as a civilian mammographer.  Lewis was promoted to chief of the mammography department, but, in

2010, lost that title as the Air Force replaced all civilian department heads with enlisted personnel. Between 2014 and 2016, Lewis's supervisor at Elgin was Beverly Gladle. But in August 2016, Gladle left her position, and Eric Person, a Black male under the age of forty, appointed Hannah Davis, a part-white and part-Asian female under the age of forty, as Lewis's supervisor.

In December 2018, Lewis filed suit against the Air Force, alleging three claims: (1) race discrimination in violation of Title VII, 42 U.S.C. § 2000e-16(a); (2) age discrimination in violation of the ADEA, 29 U.S.C. § 633a(a); and (3) retaliation in violation of Title VII, 42 U.S.C. § 2000e-16(a). Lewis alleged that several of the Air Force's decisionmakers, including Person, Davis, Jesse Thomas, and David Ives, had discriminated against her. She generally alleged that: (1) Davis was appointed as her supervisor in retaliation for complaints that Lewis previously made; (2) Davis admonished her for failing to use a non-mandatory sign-in board; (3) Davis frequently berated her; (4) Davis reprimanded her for events that did not occur and proposed a ten-day suspension; (5) Lewis was not given feedback after a negative performance evaluation; (6) decisionmakers removed Lewis's rights to access patient information; and (7) Lewis was eventually completely removed from patient care. Lewis claimed that all the decisionmakers' actions were fueled by discriminatory animus.

Before filing her complaint, Lewis also filed formal complaints with Eglin's Equal Employment Opportunity Office ("EEO"), in which she alleged: (1) Person discriminated against her

4                    Opinion of the Court                    20-12463

on the basis of age and reprisal by appointing Davis as Lewis's supervisor; (2) Davis discriminated against her on the basis of race and reprisal when Davis issued an oral admonishment on August 29, 2016, based on Lewis's failure to use the sign-in board; (3) Davis discriminated against Lewis on the basis of reprisal by issuing a notice of reprimand for disrespect and insubordination in November 2016; (4) Davis discriminated against Lewis because of her age and race and Lewis was reprised against when issued a notice of proposed suspension in January 2017; (5) Jeffrey Alder discriminated against Lewis based on her race and reprisal when he removed her ability to access protected health information ("PHI") and personally identified information ("PII") on February 9, 2017; and (6) Scott Super discriminated against Lewis based on her race and reprisal on February 14, 2017, when he removed Lewis from patient care.

The parties conducted discovery, and following discovery, the Air Force moved for summary judgment on all of Lewis's claims. In support of its motion, the Air Force submitted declarations and deposition excerpts from Air Force employees and decisionmakers, records from Lewis's equal employment complaints, and various memoranda, emails, and documents relating to Lewis's employment. The record evidence supporting the Air Force's motion for summary judgment is as follows:

Davis, the Non-Commissioned Officer in Charge ("NCOIC") of the Eglin mammography department, stated the following in her declaration. Davis knew Lewis's race but not her age. Davis knew that Lewis had previously filed an EEO complaint

against a prior supervisor and learned of the current EEO activity on August 11, 2016, when Lewis requested union time off to prepare for an EEO meeting. Davis stated that, after Gladle's departure, she became Lewis's supervisor because Davis was already the NCOIC over mammography and the only enlisted individual in the department. Lewis was the only civilian employee in mammography under Davis's supervision. Davis previously reported Lewis for bullying and disrespect toward Davis in April and July 2016. In July 2016, Davis had Person contact Lewis because Lewis had failed to use the white board and was missing from assigned patient care.

Regarding the notice of oral admonishment, Davis stated that Lewis had failed to use the white board on August 25 and 26, 2016, after being told to do so. Although Lewis claimed that the white board did not become mandatory until Mark Batcho decided her union grievance on the issue in September 2016, Lewis had previously used the board in early 2016, Davis was unaware of any rule prohibiting requiring a union employee from using the board, and union officials told Davis on August 12 that the department was free to use the board. Davis gave the notice because Lewis had failed to use the board, Lewis was previously verbally warned, and human resources said that the oral admonishment was the proper response. After Davis gave this admonishment, the two met in Davis's office on August 30, and Lewis yelled at Davis because Davis was reviewing paperwork relating to the admonishment but did not immediately give Lewis the paperwork. When Lewis returned later that day with a grievance form for Davis to sign, Lewis

became upset that Davis took time to look over the form instead of immediately signing it. Mammography had only two other employees at the time, and both used the white board. Davis maintained that she did not admonish Lewis because of her race, age, or protected activity. Davis also responded to Lewis's allegations that Davis had ordered her to improperly certify certain quality assurance records in May 2016, which Lewis was not qualified to review, and that she frequently yelled at and disrespected Lewis. Davis stated that she only issued the reprimand because of Lewis's rudeness, Lewis never told her that she was not permitted to review the files, Davis had not threatened Lewis's job, and Davis was not authorized to review the files.

According to Davis, by October 2016, Lewis was still not using the white board and was taking hour-long lunches, which she was not permitted to do. Lewis was reprimanded because of her actions and not because of any impermissible factors. No other employee under Davis's supervision was rude or disrespectful like Lewis was. Regarding the January 2017 notice of proposed ten-day suspension, Davis stated that Lewis had sent her a form to sign regarding Lewis's approved time off on October 19, 2016. Davis was out of the office that day attending training. On October 26, Davis was running late for an appointment and was unable to sign the form, so she told Lewis to use the white board to record her absence. Lewis then yelled at Davis in front of other employees and patients, and Thomas ultimately signed the form. On November 14, Davis emailed Lewis, telling her that she was scheduled to

perform a procedure on November 23, which required only one technologist.  Lewis told Davis via a November 18 email that she would not be performing the procedure, but Davis was on leave on that day.  Lewis claimed that, pursuant to an October 31 performance evaluation, her performance was marked as less than acceptable in three areas, and she sought clarification as to whether she could perform the scheduled procedure, considering her evaluation and the department's usual policy of requiring two technologists for this procedure.  During a December 20 meeting between Lewis and Davis, Lewis became insolent and did not allow Davis to discuss Lewis's duties and personnel file.  Davis chose a suspension as the appropriate option for Lewis after consulting with human resources.  No other employee under Davis's supervision was insubordinate or insolent like Lewis, and Davis stated that Lewis was not suspended because of her race, age, or protected activity.

Davis's declaration continued. Davis was on leave when Lewis violated HIPAA, but after being told about how Lewis sent protected information to her union representative, she reported that fact to Thomas and Kenneth Humphries, the privacy officer. Davis instructed Lewis to complete remedial privacy training, which Lewis did not complete despite receiving two extensions. Davis was instructed to remove Lewis's access to the systems that contained PHI and PII, and Lewis was later removed from mammography. Davis stated that, contrary to Lewis's allegations, Davis never sent emails with unencrypted PHI or PII or sent protected

information to the union.  Davis was not involved in the decision to reassign Lewis out of mammography.

In her deposition, Davis testified to the following.  In the October 2016 performance evaluation, she did not question Lewis's performance relating to the scheduled procedure but instead questioned Lewis's administrative skills.  She specifically told Lewis that Lewis was competent to perform stereotactic procedures.  Davis reported Lewis's HIPAA breach but did not make any recommendations to Humphries about it.  After Davis reported the HIPAA violation, Super initiated a quality assurance investigation of Lewis.  Additionally, the Air Force submitted emails and memos from Davis supporting the statements she made in her declaration and deposition.

In his declaration, Person, the Chief of Diagnostic Imaging and Lewis's third-level supervisor, stated the following.  He knew Lewis's race, did not know her age, was aware of her prior EEO activity, and became aware of her current EEO complaint sometime in 2016.  He assigned Davis as Lewis's supervisor because Davis was the only active-duty individual in the mammography department, and not because of Lewis's race, age, or protected activity.  When Lewis complained in April 2016 that Davis was invading her personal space, Person told Davis to stop.  Regarding the August 2016 admonishment for failing to use the white board, Person knew only what Davis and Thomas relayed to him.  Regarding the October 2016 proposed reprimand, Person did not witness the underlying event because he was on leave.  Person also lacked

knowledge of the underlying event as to the proposed suspension. In early 2016, in a meeting between Lewis, Person, Olivia Rainey, and Thomas, which was held after Lewis called Rainey incompetent, Thomas referred to Lewis as being confrontational and abrasive but did not mention Lewis's EEO activity.

In his declaration, Thomas, Lewis's second-level supervisor, stated the following. He knew Lewis's race, did not know her age, was unaware of her prior EEO activity, and learned of her current complaint in December 2016. The office took the white board away while Lewis's union grievance was pending but put the board back once it was cleared to do so. Lewis could not combine any fifteen-minute breaks with her lunch. Lewis was the only civilian employee that Thomas had disciplined for two years, and no other employee was rude and disrespectful. He did not discipline Lewis because of her race, age, or protected activity. Regarding the notice of suspension, Thomas stated that Lewis told him that she would not assist with the November 2016 scheduled procedure. He denied ever saying that Lewis was a "problem child" because of her EEO activity. On December 15, 2016, Thomas prepared a memo regarding Lewis's refusal to perform the November 23 procedure, as Davis was on leave. While Davis had told Lewis that she was scheduled for the procedure, Lewis stated that she would not perform because of her low performance evaluation. Thomas then had to cancel the procedure.

Gladle, Lewis's direct supervisor from April to August 2016, stated the following in her declaration. She explained that once the

union approved use of the white board for employees to sign in and out of work, Lewis still did not use it. In 2016, Gladle attended a meeting with Lewis, Person, Thomas, and Rainey based on a dispute that Lewis had with Rainey. Gladle stated that Thomas did not mention Lewis's EEO activity or call Lewis a "problem child."

In his deposition, Mark Batcho stated the following. He was unaware that Lewis had filed an EEO complaint prior to 2016 and that she had filed a complaint in 2016. Before Davis became Lewis's supervisor, Person and Ives unofficially complained to Batcho about Lewis's behavior. Batcho denied Lewis's grievances against Davis. Although Lewis complained that she was ostracized in the office, Batcho could not corroborate her claims. In a September 23, 2016, memo, Batcho responded to a union grievance that Lewis filed after receiving the oral admonishment for her failure to use the white board. Batcho noted that Lewis had used the white board prior to filing the grievance and that the union became aware of the white board in July 2016. After the white board was placed back into service, Davis told the department on August 17 that the board was required, but Lewis failed to use the board three times and was given the oral admonishment. Batcho concluded that requiring Lewis to use the white board was not contrary to the labor agreement. In another decision responding to Lewis's grievance that Davis had created a hostile work environment, Batcho concluded that there was no evidence that Lewis was harassed or bullied. Similarly, in a July 29, 2016, memo, Ives, in response to

grievances from Lewis, stated that he could not corroborate her allegations that Davis harassed her.

According to the notice of proposed reprimand, Davis told Lewis that she would be disciplined for (1) the rude and disrespectful behavior from August 31 and (2) Lewis's continual non-use of the white board. And Lewis's progress review worksheet, which was prepared by Davis, stated she needed significant improvement in: (1) day-to-day operations; (2) responsibility for assigned quality control program and maintenance of equipment; and (3) performance of miscellaneous administrative functions. Lewis was also marked as needing significant improvement for her cooperation, organizational skills, communication, timeliness, and thoroughness. Davis noted that Lewis needed to review radiology film more carefully, did not always complete her assigned tasks, tended to disregard the chain of command, and would not ask questions about tasks when confused about them.

On January 4, 2017, Lewis was given a notice of proposed ten-day suspension based on three events from late 2016. First, on October 26, Lewis "loudly and belligerently" refused to use the white board. Second, Lewis had refused to perform a procedure that had been scheduled for November 23, which led to a delayed finding of cancer in a patient. Third, Lewis was insolent toward Davis on December 20, when, in a meeting to discuss Lewis's job duties, Lewis talked over Davis and questioned the purpose of their meeting. A memo prepared by Jennifer Hinze, assistant NCOIC,

stated that Lewis was unprofessional and yelled at Davis when Davis told Lewis to use the white board to record an absence.

On November 30, 2016, and January 5, 2017, a medical administrative assistant emailed Davis, telling her that several patients had not been placed on the appropriate tracker. On January 5, 2017, Davis forwarded an email from a medical administrative assistant about patients not being place on the appropriate tracker to Lewis and told her to follow up on the matter. On January 10, Lewis replied that she was confused and that Davis was "being accusatory toward" her. Lewis carbon copied Alan Cooper, her union representative, on the email. The email chain contained patient information.

On January 31, 2017, Humphries, a white male over the age of forty and the HIPAA privacy officer, emailed Lewis and stated the following. Lewis had sent Cooper three emails that contained patient PII and PHI, which was a violation because Cooper did not have a valid reason to receive the information and the information was not sufficiently redacted. He requested that, if she needed to send the representative PII or PHI, she first clear it through him or someone on the legal team. He asked her to "reply to this email indicating that [she had] read and [understood] the information and instructions provided and [would] comply with this guidance." Lewis responded, stating that she would "continue as always" to abide by HIPAA and privacy rules. On February 1, Humphries emailed Lewis, stating that her use of "as always" was concerning and made her response insufficient. He gave her exact language to

use and told her to respond by close of business. On February 14, Lewis responded, explaining that she had been on leave. She then stated: "As requested your reply statement, I need you to state 'I will not transmit or release Protected Health Information (PHI) outside of the covered entity (96 MDG) without approval from 96 MDG HIPAA Privacy Officer or Medical Law Consultant (MLC) Office.'"

In his declaration, Humphries stated the following. He learned of Lewis's race on January 24, 2017, did not know her age, was not aware of her prior EEO activity, and learned of her current EEO activity on February 27, 2017. On January 10, Lewis sent two emails to the union that contained the same four patients' PHI. On January 20, she sent another email with an attachment that had PHI and PII—the last four digits of a Social Security Number. The union representatives did not have a need to know this information, so Lewis's email violated HIPAA and Air Force regulations. When Humphries attempted to speak to Lewis about the matter on January 24, she requested that he instead send her an email. After consulting with Alder, Humphries decided that Lewis's January 31 response was not clear enough, so he sent her another email on February 1 that contained specific language that she needed to use. Humphries sent the email, which told Lewis to respond by the close of business, at 11:33 a.m. and received a read receipt that same day. When she did not do so, Alder suspended her access to PHI and PII on February 2 until she provided the satisfactory response. Lewis responded on February 14, which

Humphries and other officials deemed to still be unsatisfactory. Humphries noted that the original email from Davis was not encrypted, which was in error, and Davis received remedial training. By sending unencrypted information to Lewis, who had a need to know, Davis's breach was less serious than Lewis's, who sent PHI to someone without a need to know. Generally, Eglin would not suspend PHI/PII access for someone who committed a violation like Davis's. And Humphries explained that if Lewis had provided a satisfactory email response, her access would not have been suspended.

In a February 9, 2017, memo, Alder, a white male over the age of forty, suspended Lewis's access rights because of her prior breach and her failure to respond to Humphries's February 1 email. In his declaration, Alder stated the following. He knew Lewis's race, did not know her age, was unaware of her prior EEO activity, and learned of her current EEO activity in March 2016. After consulting with Humphries and reading Lewis's email response, he did not feel that Lewis understood that her email to the union violated HIPAA or that she would not do so again. In deciding to suspend her access, he did not consider her race, age, or protected activity. Alder met with others, including Super, regarding Lewis's actions and decided that her conduct would likely result in increased patient risk. Super then decided to remove Lewis from patient care pending a quality assurance investigation. Because of her suspension and her removal from patient care, Lewis was temporarily reassigned so that she could continue to work elsewhere on the base.

And, in his deposition, Alder stated that Lewis's response was unprofessional and unsatisfactory and that she could have returned to radiology had she passed the quality assurance investigation.

According to a February 14, 2017, memo prepared by Super, Lewis was removed from patient care because she had refused to participate in scheduled procedures, violated patient privacy, and failed to adequately assure her supervisors that she would not violate patient privacy again.  Lewis was informed that the Air Force would conduct a quality assurance investigation.  In his deposition, Super stated that he gathered the information in his memo from others in the radiology department but could not remember specifically to whom he spoke.  In his declaration, Super, a white, forty-year-old male and the manager for diagnostic imaging, stated the following.  He did not know Lewis's age, only learned of her race when they met on February 9, did not know of her prior EEO activity, and learned of her current EEO activity when he was contacted for the investigation.  When he told her of the removal decision, she left and would not let him explain the decision.  Super had not moved any other civilian employee for violating patient privacy in the past two years.

In a March 13, 2017, memo, Ives, a white male over the age of forty and Lewis's fourth-level supervisor, affirmed Lewis's ten-day suspension without pay.  Ives explained that her October 26 outburst, refusal to perform an assigned procedure, and insolence toward her supervisor were serious actions that warranted discipline.    Regarding    the    procedure,    Ives    noted    that    Lewis's

performance evaluation never stated that she could not perform safe medical care. Ives further explained that, by refusing to perform the procedure, she failed a basic job duty. Ives noted that no other employee under his supervision had exhibited conduct like Lewis's.

In his declaration, Ives stated the following. He knew Lewis's race but not her age, was unaware of her prior EEO activity, and became aware of her current complaint on March 20, 2017, when he was contacted by the investigator. Regarding the assignment of Davis as Lewis's supervisor, Ives made the decision after consulting with Person and Thomas. Lewis never objected to Ives regarding Davis's assignment, and Davis was assigned because she was the NCOIC of mammography. Regarding the suspension, he did not personally witness the underlying events and relied on the notice of proposed suspension, Lewis's response, and other supporting evidence. He received guidance from human resources, which provided him with a template of factors to consider when imposing discipline. Ives relied on the "ample evidence" against Lewis when suspending her and did not rely on her race, age, or protected activity.

The quality assurance investigation into Lewis was completed on April 25, 2017, and Christina Haupt summarized the results in a memo prepared for Super, which stated the following. Lewis was the only person available to perform the stereotactic procedure on November 23, so when she refused to perform, the procedure was cancelled. Lewis previously received training for

this procedure on April 14, 2016.  On January 31, 2017, Lewis was assigned to perform another stereotactic procedure, along with Jennifer Newland.  Lewis did not assist, explaining to Davis that she believed that the department's protocol regarding the number of required technologists had changed.  Davis explained that the policy had not changed, with two technologists being preferred.  On several occasions, Lewis was asked questions during her job by the radiologists but did not answer.  Lewis also had previously walked out of a patient exam room, refused to complete an examination of another patient, and told another patient to Google any questions that she had.  The memo also stated that the Food and Drug Administration ("FDA") requires certain documents, and when Davis requested them from Lewis, Lewis replied that Davis already had the documents even though they were not in Davis's binder.  In May 2016, the FDA cited the department because Lewis was delinquent in her continuing education.  Lewis was a steward for her union, and because of her duties, she saw approximately 1,000 fewer patients than the other technologists from April 2015 to March 2017.  She also had refused to help train new technologists, had not performed administrative duties, and had failed to update the patient tracker to timely notify patients.  Other employees described being around Lewis as "tense, hostile and toxic."

Haupt was unable to speak with Lewis during the investigation, as when Haupt went to do so, Lewis said that "she would let [Haupt] know if a Union Representative would be able to meet" for the interview.  Haupt concluded that Lewis should be removed

from patient care because she was "careless" and had refused to perform required job duties.

A two-member peer review panel reviewed Haupt's memo, and in a May 24, 2017, memo, found that Lewis was unethical, was unprofessional, and had failed to perform all assigned duties. It agreed with the decision to remove Lewis from patient care because she "pose[d] an unconscionable threat to patient safety" and was not following relevant medical guidelines. In a June 27, 2017, memo, Super told Lewis that the panel had affirmed the decision to permanently remove her from patient care. In an August 2, 2017, memorandum, Colonel Pamela Smith, commander of the 96th Medical Group, approved the recommendation to permanently remove Lewis from patient care. In her declaration, Smith stated that, when she issued the memo, she was unaware of Lewis's race, age, or EEO activity, and she made the decision to remove Lewis from patient care based on Haupt's report and the peer review panel's decision.

In response to the Air Force's motion for summary judgment, Lewis submitted her own affidavit and deposition, personnel records, emails, the labor agreement between the union and Eglin, and depositions from other Eglin employees. In her own deposition, Lewis stated the following. While working in the Air Force, Lewis was the oldest employee and only black employee in mammography. She was currently a Naval employee in Japan but planned to return to the Air Force when she left to regain the same job as a mammographer. Since starting in Japan, she had not been

disciplined or admonished and received excellent performance evaluations. Before Davis became her supervisor, Lewis had received awards for being the civilian of the squadron in 2014 and 2015. But in May 2016, Lewis received a negative performance evaluation from Gladle that was based on comments from Davis. In July 2016, Lewis received a poor evaluation from Gladle, but it was based on comments from Davis. And once Davis became her supervisor, Lewis received poor evaluations.

Lewis contacted EEO about a December 15, 2015, meeting of the radiology department during which she was labeled as a "problem child" and Thomas said that nobody liked her—Lewis believed this was said because of her age and race. In April 2016, Davis yelled at Lewis and was in Lewis's personal space. Davis's treatment and harassment caused Lewis to seek medical treatment from her primary care doctor. Lewis denied ever being belligerent to Davis. Davis once told Lewis that "[her] people speak in a rude tone." Davis also frequently belittled Lewis, both in private and around others. Neither Thomas, Person, nor Ives took steps to stop Davis's behavior. After Lewis filed a union grievance against Davis, Gladle gave Lewis time to meet with the union on July 8, 2016. While Lewis was at that meeting, she received a call from Person, who said that Davis had complained that she did not know where Lewis was. After Lewis said that she was at a meeting regarding a union grievance about Davis, Person informed Lewis that he planned to make Davis her supervisor.

Lewis stated that the white board was not mandatory for her to use until September 2016 and that she probably did not use the white board on July 8 because it was not mandatory. Lewis was the only civilian employee required to use the white board. She received a department-wide email from Davis that instructed employees to use the white board. Regarding the August 30, 2016, meeting, Lewis did not recall being rude to Davis but denied storming out of Davis's office. Regarding the October 26 incident where Lewis allegedly yelled at Davis, Lewis stated that Air Force regulations required her to get her supervisor to sign an official form before taking union time, so the white board was insufficient. Lewis admitted that she did not use the white board to record her October 26 time off. Regarding the October 2016 proposed reprimand, Lewis denied being rude, argumentative, and disrespectful toward Davis. Lewis believed that Davis influenced other decisionmakers into imposing the discipline that Davis was not directly responsible for. Regarding the November 2016 procedure, she denied having refused to perform. She admitted that performing the procedure was part of her job duties, and Davis had authority to schedule Lewis to perform. Lewis admitted to not performing the procedure. But she was concerned about her evaluation and asked Davis for a performance plan or for assistance with the procedure.

Lewis knew of the Air Force patient information policies and of federal privacy laws. Because of her EEO activity, she emailed every communication that she had with Davis to her union representative. Lewis believed that the union representative had a need

to know the patient information because of the ongoing EEO case, but she could not identity a medical need.  She claimed that Davis sent Lewis an unencrypted email with patient information, and Lewis encrypted it, replied to Davis, and carbon copied her union representative.

Humphries told Lewis to complete remedial privacy training, which Lewis did not believe was because of her race or age. When emailing Humphries, she admitted to saying that she would continue "as always" to follow privacy rules, and she was told that this response was insufficient.  She recalled receiving the response from February 1, 2017, but was unsure if she had sent a read receipt or if she read it before leaving work.  She learned that her information-access rights were suspended when she returned.  On February 14, 2017, Lewis was removed from patient care pending the quality assurance investigation, which recommended that she stay removed.  As a result of her removal, her pay was not reduced, but her licensure was at risk because she was not able to perform enough patient exams.  Lewis stated that the peer review process did not involve interviewing her.  She applied for the Japan job because she was removed as a mammographer at Eglin and wanted to maintain her licensure.

Lewis also stated the following in her affidavit.  In April 2016, Davis asked Lewis to verify certain documentation in preparation of an FDA audit.  When Lewis replied that she could not verify the records because she had not performed the tests, Davis replied that she was trying to "save [Lewis's] job," which Lewis

interpreted as a threat. Lewis filed a union grievance and an EEO complaint, alleging that Davis had created a hostile work environment. When Lewis used sick leave to visit her doctor, Davis demanded that Lewis file a doctor's note, which other employees were not required to do. The first oral admonishment Lewis received was before the white board was mandatory for union employees. Although Davis claimed that Lewis was disrespectful on August 30, 2016, Lewis disputed this characterization, despite facing "abusive diatribes" from Davis.

Although Lewis was told that she could not combine fifteen-minute breaks with her thirty-minute lunch and take any fifteen-minute breaks, her younger, white coworkers took breaks. In October 2016, Davis gave notice of a proposed reprimand, which was duplicative of the discipline from August. No other employee was disciplined for failing to use the white board. Lewis filed her formal EEO complaint on October 21, 2016. In her October 31 performance evaluation, Davis failed to explain to Lewis why she was rated poorly, and what duties she could still perform, and failed to place Lewis on a performance improvement plan. Because of her poor evaluation, Lewis asked for clarification about the November 23 procedure, but she never refused to perform. On December 16, Thomas stated that Lewis could perform any duty within her job description. Lewis further stated that the notice of proposed suspension was untimely, as more than forty-five days had passed since the relevant event.

When Humphries sent his second email about HIPAA on February 1, Lewis was away for training, and when she returned on February 14, she learned that her access to patient information had been suspended. Although she complied with Humphries' email and completed remedial HIPAA training, her access was not restored. When she met with Ives on February 14, Ives laughed at her allegations, and Lewis was not interviewed any further. The quality assurance investigation involved accusations that Lewis was never informed about nor punished for. The investigator also did not cooperate with Lewis's request to schedule an interview with a union representative. Lewis never refused to answer questions from other employees, cooperate with a pending investigation, perform a procedure, or intentionally act insubordinately. Lewis was replaced by Newland, who was younger and white.

Cooper, a union representative for Eglin, stated the following in his deposition. The white board was not originally mandatory for union employees like Lewis and did not become mandatory until September 2016. He participated in several meetings with Lewis and Davis, and Lewis was never insubordinate. But, in one meeting between the two, Davis was loud, belligerent, and combative. The October 2016 feedback Lewis received was issued when Davis had little experience with mammography, and Davis was argumentative toward Lewis once Davis arrived. This feedback was much lower than Lewis's previous feedback. Cooper did not believe that Lewis violated HIPAA because she was communicating with him as part of an internal grievance and the email was

encrypted.  While Lewis was meeting with Cooper on July 8, 2016, Person called her, during which Cooper described Person as loud and rude.  Cooper told Person that Lewis was not obligated to tell Davis that she was leaving because Lewis had been permitted to meet with Cooper at that time.

Lewis also raised a portion of Person's deposition, in which he stated that there was no official policy requiring that an enlisted individual to be in charge of the department.  Person also stated that Davis received verbal counseling because she invaded Lewis's personal space.

Newland, a mammographer at Elgin, stated the following in her deposition.  Davis was Newland's supervisor while Newland was a contractor and at the beginning of her time as a full employee.  And Newland was hired for Lewis's old position.  In her deposition, Diana Cobo, a contract mammographer, stated that she was unaware of any difficulties between Davis and Lewis and never saw Lewis do anything below the standard of care for the job.

The district court granted the Air Force's motion for summary judgment on all of Lewis's claims.  As to Lewis's race and age discrimination claims, the district court found that Lewis had not established a *prima facie* case because she failed to demonstrate evidence of a comparator employee who was treated differently.  As to her retaliation claim, the district court found Lewis's claim failed because she had not established but-for causation.  The court also found that the oral admonishment and proposed reprimand against

20-12463                Opinion of the Court                25

Lewis were not actionable as to her retaliation claim.  This appeal ensued.

## II.

Our review of a district court's grant of summary judgment is *de novo*. *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012).  Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(a)).  We view the record and draw all justifiable inferences in favor of the nonmoving party, but "inferences based on speculation are not reasonable." *Id.* at 1301 (quoting *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986)).  We will not make credibility determinations or weigh the parties' evidence at the summary judgment stage. *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001).

## III.

We first address Lewis's race and age discrimination claims. Title VII makes it unlawful for the Air Force to discriminate against an employee based on her race. *See* 42 U.S.C. § 2000e-16(a) (applying Title VII to the "military departments" as defined in 5 U.S.C. § 102); 5 U.S.C. § 102 (providing that the Department of the Air Force is a military department).  Section 2000e-16 gives federal employees the same protections that Title VII grants to private employees. *See Brown v. GSA*, 425 U.S. 820, 829–30 (1976); *Canino v. U.S. EEOC*, 707 F.2d 468, 472 (11th Cir. 1983).  The ADEA, in turn,

states that "[a]ll personnel actions affecting employees . . . who are at least 40 years of age . . . shall be made free from any discrimination based on age" and similarly applies to military departments, as defined by § 102, including the Air Force. *See* 29 U.S.C. § 633a(a); 5 U.S.C. § 102.

An employee can prove intentional discrimination using direct, circumstantial, or statistical evidence. *Alvarez v. Royal Atl. Devs.*, 610 F.3d 1253, 1264 (11th Cir. 2010). Before the Supreme Court's decision in *Babb v. Wilkie* ("*Babb I*"), 140 S. Ct. 1168 (2020), we had held that an employee may rely on the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to prove a race or age discrimination claim using circumstantial evidence. *Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002) (applying *McDonnell Douglas* to Title VII); *Trask v. Sec'y, Dep't of Veterans Affs.*, 822 F.3d 1179, 1191 (11th Cir. 2016) (applying *McDonnell Douglas* to an ADEA claim), *abrogated by Babb I*, 140 S. Ct. 1168. Under *McDonnell Douglas*, the employee must first

> establish[] a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated "similarly situated" employees outside her class more favorably.

*Lewis v. City of Union City* ("*Lewis I*"), 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc). If an employee makes her *prima facie*

case, then the employer must show that there was a "legitimate, nondiscriminatory reason for its actions." *Id.* at 1221. Should the employer carry its burden, the employee must prove that the employer's proffered reason was merely a pretext for unlawful discrimination. *Id.*

For a plaintiff to establish the fourth element of a *prima facie* case of discrimination—commonly known as the "comparator" analysis—the plaintiff must proffer a comparator employee that is "similarly situated in all material respects" to the plaintiff. *Id.* at 1226. This determination relies on the individuals' "substantive likenesses," and a comparator may be sufficiently similar if she has "engaged in the same basic conduct (or misconduct) as the plaintiff," was subject to the same employment policies as the plaintiff, had the same supervisor, and "share[d] the plaintiff's employment or disciplinary history." *Id.* at 1227–28.

An employee's failure to provide a comparator, however, does not automatically doom her claim, as she can "survive summary judgment if [she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Lewis v. City of Union City* ("*Lewis II*"), 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Smith v. Lockheed-Martin Corp.* 644 F.3d 1321, 1328 (11th Cir. 2011)). This occurs when the employee "presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Smith*, 644 F.3d at 1328 (11th Cir. 2011) (footnote omitted) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th

Cir. 2011)).  Such a mosaic may exist when the evidence shows "(1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis II*, 934 F.3d at 1185 (alteration in original) (quoting *Silverman*, 637 F.3d at 733–34).

*McDonnell Douglas* applies when an employee brings a "single-motive claim," in which she must show the discriminatory reason was "the true reason for the adverse action." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016).  An employee who brings a "mixed-motive claim" may instead rely on the more lenient motivating-factor test, in which she must only show that "illegal bias . . . 'was a motivating factor' for an adverse employment action, 'even though other factors also motivated' the action." *Id.* (quoting 42 U.S.C. § 2002e-2(m)).  These two tests thus "serve as alternative causation standards for proving discrimination." *Id.* at 1235 n.4; *see also Babb v. Sec'y, Dep't of Veterans Affs.* ("*Babb II*"), 992 F.3d 1193, 1204–05 (11th Cir. 2021) (recognizing that *McDonnell Douglas* should not be used where the statute does not require but-for causation).

But recently, in *Babb I*, the Supreme Court determined that a district court had erred in evaluating an ADEA claim under *McDonnell Douglas* because § 633a(a)'s statutory language only requires that "age must be the but-for cause of *differential treatment*, not that age must be a but-for cause of the *ultimate decision*."  140

S. Ct. at 1171–74 (emphasis in original); *see* § 633a(a).  The Court also explained that but-for causation remains relevant for an employee's remedies, as employees "who demonstrate only that they were subjected to unequal consideration cannot obtain reinstatement, backpay, compensatory damages, or other forms of relief related to the end result of an employment decision." *See Babb I*, 140 S. Ct. at 1177.  The Supreme Court then remanded the case to us for further proceedings.  *Id.* at 1178.

On remand in *Babb II*, we recognized that, because § 2000e-16(a) contained the same language as § 633a(a), the Supreme Court's analysis from *Babb I* controlled. *See* 992 F.3d at 1204 ("The question is whether Babb's analysis of the ADEA 'undermined [*Trask's* Title VII holding] to the point of abrogation.'  Because Congress chose to enact twin statutory provisions, the answer is yes." (quoting *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008))).  Therefore, we concluded § 2000e-16(a) did not require but-for causation, at least in relation to retaliation claims.  *Id.* at 1204–05 ("If a decision is not 'made free from any discrimination based on' that which § 2000e-16(a) protects, then an employer may be held liable for that discrimination regardless of whether that discrimination shifted the ultimate outcome.").

Turning to this case, as an initial matter, we address Lewis's federal race and age discrimination claims under the comparator analysis set forth in *Lewis I*.  *Babb I* and *Babb II* foreclosed using the full *McDonnell Douglas* framework regarding ADEA claims and Title VII retaliation claims as to federal-sector employees, but

those two opinions concerned the second and third steps of that framework—that the defendant to articulate "a legitimate, nondiscriminatory reason for its actions" and, then, for the plaintiff to demonstrate that the "proffered reason was merely a pretext for unlawful discrimination," see *Lewis I*, 918 F.3d at 1221—which established a "but-for causation" requirement that has now been disapproved by the Supreme Court and this Court.  But a federal sector employee alleging Title VII and ADEA claims must still establish a *prima facie* case that a decision was not "made free from any discrimination," and neither *Babb I* nor *Babb II* suggested that the comparator analysis in *Lewis I* is inappropriate under the new standards.  *See Babb I*, 140 S. Ct. at 1171–76; *Babb II*, 992 F.3d at 1198–1209.  And, as this Court held in *Smith*, a "failure to produce a comparator does not necessarily doom the plaintiff's case," as a plaintiff will survive summary judgment if she "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent," i.e., "a convincing mosaic of circumstantial evidence."  644 F.3d at 1328 (quoting *Silverman*, 637 F.3d at 734).

Because the district court here found that Lewis had failed to establish a *prima facie* case as to her race and age discrimination claims on the basis that she had not identified a comparator, we will apply *Lewis I*'s comparator analysis to this appeal.

After reviewing the extensive record evidence, we conclude that the district court did not err in determining that Lewis had failed to provide evidence of a comparator employee—one

similarly situated in all material respects—who was treated differently.  As explained above, Lewis had the burden to show that the Air Force treated similarly situated employees differently.  The record evidence, however, showed that Lewis was the only civilian employee in mammography and that no other employee engaged in similar misconduct, such as (1) failing to use the office's white board for signing in and out; (2) violating the Air Force's privacy policies including HIPAA by sending patient information to non-medical personnel who lacked a need to know the information; or (3) failing to perform a scheduled medical procedure.

While Lewis offered two purported comparators—Davis and Newland—we conclude that these comparators are insufficient to establish a *prima facie* case for her discrimination claims.  Turning to Davis, the record evidence shows that Davis sent an email to Lewis with patient information that was not encrypted, she did not send the patient information to non-medical personnel.  In other words, Davis sent patient information to a person within the department—Lewis—with a need to know that information, while Lewis sent patient information to Cooper, her union representative, who did not possess a medical need to know that information.  As Humphries explained, the degree of Davis's violation was less serious, and Davis still had to complete remedial training for that violation.  By contrast, Lewis did not complete remedial training before her access was suspended nor respond to Humphries's February 1 email by the close of business, and Humphries determined Lewis's email responses to him about her

understanding of the privacy violations to be unsatisfactory. Furthermore, Davis did not engage in any of the other conduct that was the basis for Lewis's suspension and removal. Therefore, we conclude that the district court did not err in determining Davis was not a sufficient comparator, as Davis was not similarly situated in all material respects to Lewis.

Turning to Newland, we also conclude that Newland is similarly an insufficient comparator. Indeed, there is nothing in the record suggesting that Newland engaged in the same basic misconduct or shared the same disciplinary history as Lewis. *See Lewis I*, 918 F.3d at 1227–28. Thus, Lewis and Newland are not similarly situated in all material respects. And because Lewis did not offer a comparator, Lewis failed to establish a *prima facie* case, and the district court was not required to reach causation or pretext.

As for her convincing mosaic argument, we find that Lewis has abandoned that argument by failing to raise the issue before the district court.[1] *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004); *FDIC v. Verex Assurance, Inc.*, 3 F.3d 391, 395 (11th Cir. 1993). Indeed, we have recently found a plaintiff

---

[1] Similarly, the Air Force has abandoned its argument that Lewis did not exhaust her administrative remedies relating to the March 2017 suspension because it raised the argument in only one footnote. *See Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1209 n.5 (11th Cir. 2019) ("We do not ordinarily consider arguments raised in passing in one footnote rather than the body of the brief."); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).

failed to preserve a "convincing mosaic" argument by failing to adequately brief the issue below. *See Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1273–74 & n.1 (11th Cir. 2021) (determining that an employee had abandoned the claim because he only cited the general "convincing mosaic" law but did not tie that law into his claim).

Accordingly, we affirm the district court's grant of summary judgment on the race and age discrimination claims in favor of the Air Force.

## IV.

We now turn to Lewis's retaliation claim. Title VII states that "[a]ll personnel actions . . . shall be made free from any discrimination. § 2000e-16(a); *Porter v. Adams*, 639 F.2d 273, 277–78 (5th Cir. Unit A Mar. 1981)[2] (interpreting § 2000e-16(a) to prohibit retaliation). Until recently, we applied the *McDonnell Douglas* framework to a Title VII retaliation claim. *See, e.g.*, *Trask*, 822 F.3d at 1193–94; *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016).

But we recently determined that the Supreme Court's decision in *Babb I* "undermined *Trask* to the point of abrogation and that the standard that the Court articulated there now controls

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit, including decisions by either administrative unit, handed down prior to October 1, 1981.

cases arising under Title VII's nearly identical text." *Babb II*, 992 F.3d at 1196. Accordingly, we determined that the *McDonnell Douglas* framework as to causation no longer applied to a federal Title VII retaliation claim. *See id.* at 1203–05 ("So, even when there are non-pretextual reasons for an adverse employment decision—as the government says there are here—the presence of those reasons doesn't cancel out the presence, and the taint, of discriminatory considerations."). As such, we vacated the district court's grant of summary judgment and remanded for further proceedings. *Id.* at 1205.

Here, neither the parties nor the district court had the benefit of our decision in *Babb II*, and the district court only analyzed Lewis's retaliation claim under the *McDonnell Douglas* causation framework. Accordingly, we vacate the district court's grant of summary judgment on Lewis's retaliation claim and remand so that the district court may consider the claim based on the principles we set forth in *Babb II*.

## V.

For the foregoing reasons, we affirm the district court's grant of summary judgment on Lewis's race and age discrimination claims. But we vacate its grant of summary judgment on Lewis's retaliation claim and remand for further proceedings consistent with our decision in *Babb II*.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**