[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 22-10374

Non-Argument Calendar

————————————————

BOBBIE BREEDING,

Plaintiff-Appellant,

*versus*

INTEGRATED BEHAVIORAL HEALTH INC.,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:20-cv-00551-RDP

————————————————

Before JORDAN, LAGOA, and ANDERSON, Circuit Judges.

PER CURIAM:

Bobbie Breeding sued her employer Integral Behavioral Health, Inc. ("IBH"), alleging Title VII sex discrimination and retaliation and violations of the Equal Pay Act following her termination from the company. The district court granted summary judgment in favor of IBH on all counts, but on appeal Ms. Breeding only challenges the district court's grant of summary judgment as to the Title VII sex-discrimination claim.

Ms. Breeding argues that the district court improperly applied the mixed-motive standard because IBH did not assert that standard in its motion for summary judgment. She also contends that the district court improperly analyzed the case under the *McDonnell Douglas* framework. Lastly, Ms. Breeding argues that, even if the district court correctly applied the mixed-motive framework, it erred in concluding that there were no genuine dispute of material fact as to whether her gender motivated her termination.

## I

From 2007 to 2016, Ms. Breeding worked as director of sales at American Behavioral Health Benefit Managers. Her duties included both generating new sales and managing accounts. In 2016, IBH purchased American Behavioral; Ms. Breeding's job duties did not change, but her sales goal increased. In May 2018, David Sockel became the Chief Commercial Officer of IBH and was in

charge of a team of three men and five women, including Ms. Breeding.

In November of 2018, Mr. Sockel believed that his sales team needed more "hunters," that is, salespersons who work solely to generate new business, as opposed to "farmers," whose responsibilities are oriented towards administration and account management. To fill the "hunter" role, Mr. Sockel hired Peter Hendrixson.

During the first quarter of 2019, IBH was underperforming financially. In response, the company instituted a reduction-in-force mandate. To comply with the mandate, Mr. Sockel evaluated who on his team he should terminate and concluded that Ms. Breeding was a "clear cut." According to Mr. Sockel, Ms. Breeding and Carol Pinkerton performed essentially the same job in the same location, and Ms. Pinkerton was outperforming Ms. Breeding. For example, at the time of termination, Ms. Breeding had closed only $8,000 in annualized project revenue, whereas Ms. Pinkerton had closed $18,360 and was finalizing a sale worth over $50,000. Mr. Sockel identified Ms. Breeding and two other employees (Linda Murphy and Brian Thomas) as possible employees to be terminated.

On June 7, Mr. Sockel terminated Ms. Breeding and Linda Murphy. Brian Thomas resigned before IBH notified him of his termination. After the departure of these three employees, Mr. Sockel's sales team consisted of three females and two males.

After her termination, Ms. Breeding filed a Title VII sex discrimination claim against IBH.  In support of her claim, she highlighted numerous comments and actions by Mr. Sockel which she suggested constituted bias against women.  For example, Mr. Sockel allegedly yelled and cursed at Ms. Breeding, asked her why she was still working when her husband was financially successful, and suggested that customers prefer certain female employees (like Ms. Pinkerton) because of their physical appearance.  Additionally, Ms. Breeding asserted that Mr. Sockel's "farmer" and "hunter" classifications, the reduction of her sales opportunities and responsibilities, and Mr. Sockel's failure to place her on the performance improvement plan all indicate sex-based discrimination.

## II

We review *de novo* a district court's granting of summary judgment, construing all facts and drawing all reasonable inferences in favor of the non-moving party.  *See Jefferson v. Sewon, Am., Inc.*, 891 F.3d 911, 919 (11th Cir. 2018).  Summary judgment is appropriate when the record evidence shows that there are no genuine disputes as to any material facts and the moving party is entitled to summary judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  An issue of fact is not genuine unless a reasonable jury could return a verdict in favor of the non-moving party.  *See Morton v. Kirkwood,* 707 F.3d 1276, 1284 (11th Cir. 2013).  We have consistently held that conclusory allegations have no probative value at summary judgment unless supported by specific evidence.  *Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2010).

We will give credence to evidence favoring the non-movant, as well as uncontradicted and unimpeached evidence from disinterested witnesses that supports the moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## III

Ms. Breeding first argues that the district court should not have applied the mixed-motive standard in its order granting summary judgment because IBH did not make any argument as to that standard in its summary judgment motion. Because the issue was sufficiently raised by the parties in the summary judgment briefing, we affirm.

As background, there are two distinct standards of proof that a plaintiff may use to prove a Title VII gender discrimination claim: single-motive and mixed-motive. *See Quigg v. Thomas County School Dist.,* 814 F.3d 1227, 1235 (11th Cir. 2016). The single-motive standard requires a plaintiff to prove that bias against a protected class was "the true reason for the adverse [employment] action." *Id.* The lesser, mixed-motive standard, meanwhile, requires a plaintiff to prove that bias against a protected class "'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Id.* (quoting 42 U.S.C. § 2000e-2(m)). Ms. Breeding argues that the district court could not have applied the mixed motive standard in its order granting

summary judgment because IBH did not rely on it in its order granting summary judgment.[1]

A district court cannot grant summary judgment on "grounds not raised by a party" unless it first provided the parties with "notice and a reasonable time to respond[.]" Fed. R. Civ. P. 56(f)(2). Generally, the "onus" is not on the district court to "distill any possible argument which could be made based on the materials before the court" but were not raised by either party. *See Blue Cross and Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1549 (11th Cir. 1990).

While it is true that IBH did not invoke (or even reference) the mixed-motive standard in its motion for summary judgment, *see* DE 32 at 22–25 Ms. Breeding focused exclusively on it. She argued at length in her response that her gender was a motivating factor in her termination. *See* DE 37 at 27–32. In its reply, IBH acknowledged that Ms. Breeding used a mixed motive theory and that she "failed to prove gender discrimination under any theory or standard." DE 44 at 9. Under the circumstances, the district court was permitted to consider the argument because it was raised by Ms. Breeding herself and addressed (albeit briefly) by IBH.

---

[1] Oddly, Ms. Breeding seemingly argues that the district court should have applied a higher standard (i.e., the single motive standard) to her Title VII sex discrimination claim. Application of this higher standard would not have changed the district court's decision.

Ms. Breeding cites to *Gentry v. Harborage Cottages-Stuart, LLLP*, 654 F.3d 1247, 1261 (11th Cir. 2011) to support her argument that the district court improperly applied the mixed motive standard. In *Gentry*, we vacated the district court's grant of summary judgment on two claims (alleging violations of the Interstate Land Sales Full Disclosure Act's Anti-Fraud Provision and the Florida Deceptive and Unfair Trade Practices Act) even though the plaintiff did not seek summary judgment on those two claims. *See id.* We held that this was a violation of Rule 56(f)'s requirement that a district court must give the parties "notice and a reasonable time to respond" before granting summary judgment on "grounds not raised by a party." *Id.* (quoting Fed. R. Civ. P. 56(f)). But here Ms. Breeding argued that her gender was a motivating factor in her termination in her response to IBH's summary judgment motion. IBH had an opportunity to respond to the argument and did in fact briefly respond to the argument.

In short, the district court did not err in applying the mixed motive standard in granting summary judgment on Ms. Breeding's mixed motive claim.

## IV

Next, Ms. Breeding argues that the district court misapplied the mixed-motive standard by improperly interjecting "pretext" into its analysis, which is relevant to a single-motive framework but is not relevant to a mixed-motive framework. In support of her argument, Ms. Breeding points to certain phrases the district court used that are typically used when applying the *McDonnell Douglas*

standard—such as her failure to meet certain evidence "head on" and the use of the term "pretext." In response, IBH argues that this argument is overly formalistic; the relevant question is whether there is a genuine issue of material fact that gender played a role in Ms. Breeding's termination.

A mixed-motive analysis addresses whether "bias based on sex or gender 'was a motivating factor' for an adverse employment action, 'even though other factors also motivated' the action." *Quigg v. Thomas Cnty. School Dist.*, 814 F.3d 1227, 35 (11th Cir. 2016) (quoting 42 U.S.C. s. 2000e-2(m)). Unlike the single-motive analysis, which demands a "three-part burden shifting framework for determining liability" by which a plaintiff must demonstrate that an employer's "legitimate, non-discriminatory reason" is pretextual, the mixed-motive analysis requires a plaintiff to show only that "(1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was a motivating factor for the adverse employment action." *Quigg*, 814 F.3d at 1239 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008)).

The district court properly applied the mixed-motive analysis. It considered whether Ms. Breeding "presented sufficient evidence for a reasonable jury to conclude . . . that sex was a motivating factor in [Ms. Breeding's] termination." DE 45 at 13. (emphasis added). In applying this standard, the district court explicitly declined to apply the single-motive, *McDonnell Douglas* framework

because Ms. Breeding "proceeds only under a mixed motive theory." *Id.* at 12 n. 6.

The district court then analyzed each remark and action that Ms. Breeding characterized as evidence of gender bias and concluded that the evidence failed to demonstrate that gender influenced the termination decision. The district court also reviewed Ms. Breeding's evidence as a whole, analyzed whether that evidence was indicia of gender bias, and concluded that there was no genuine dispute as to whether sex motivated Ms. Breeding's termination. This constituted a sound mixed-motive analysis.

Further, the district court's ultimate conclusion was that sex did not play a role in the decision-making process. Accordingly, no matter which framework the district court employed, its conclusion would have remained the same. *See, e.g., Williams v. Hous. Auth. of Savannah, Inc.*, 834 F. App'x 482, 491 (11th Cir. 2020) (finding that "regardless of the theory or framework we apply, no reasonable jury could conclude" that the termination was "motivated by bias against [the plaintiff's] sex").

## V

To survive summary judgment on a mixed-motive claim, a plaintiff must offer "evidence sufficient to convince a jury that: (1) the [employer] took an adverse employment action against [her]; and (2) a protected characteristic was a motivating factor for the [employer's] adverse employment action." *Bowen v. Manheim*

*Remarketing, Inc.,* 882 F.3d 1358, 1364 (11th Cir. 2018) (*quoting Quigg,* 814 F.3d at 1239) (emphasis in original).

The first prong is undisputed—Ms. Breeding's termination was an adverse employment action.  To satisfy the second prong, Ms. Breeding has to show that a reasonable jury could conclude that sex motivated her termination.

Ms. Breeding relied upon several of Mr. Sockel's allegedly discriminatory remarks and actions.  The district court concluded that this evidence failed to create a genuine issue of fact as to whether sex motivated Ms. Breeding's termination. We agree.

## A

Remarks based on sexual stereotypes "do not inevitably prove that gender played a part in a particular employment decision."  *Quigg,* 814 F.3d at 1241 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)).  A plaintiff who supports her mixed-motive claim by relying upon remarks in the workplace "must show the circumstances surrounding the remarks create a genuine issue of material fact that the employer actually relied on her [sex or] gender in making its decision."  *Id.* (internal quotation marks and citation omitted).

To support her gender discrimination claim, Ms. Breeding relies on numerous comments and statements, including: Mr. Sockel yelling and cursing at her; Mr. Sockel's remarks that certain female employees were favored by clients because of their appearance; Mr. Sockel questioning Ms. Breeding about why she's still

working despite her husband's high income; and being characterized as a "farmer" rather than a "hunter." We agree with the district court that these remarks, considered in the light most favorable to Ms. Breeding, do not create a jury question as to whether gender was a motivating factor in her termination.

First, there is no allegation that Mr. Sockel's yelling and cursing at Ms. Breeding was due to her gender. Mr. Sockel's demeanor towards Ms. Breeding was no different than the way Mr. Sockel spoke to the entire team (men and women) on sales calls.

IBH's classification of employees as "farmers" and "hunters" was not gender-based but was instead predicated on employees' duties. "Hunters" facilitated sales, while "farmers" performed administrative duties. There were four farmers, two of which are male and two of which are female. Accordingly, the "farmer" and "hunter" dichotomy does not indicate gender bias.

Mr. Sockel's alleged comment that "clients only liked [Ms.] Pinkerton because of [her] physical appearance," is not indicative of gender bias. While this comment is off-putting, it does not indicate that Mr. Sockel's gender-related comments were so widespread as to motivate the decision to terminate Ms. Breeding. In *Quigg*, for example, the decisionmakers voted against hiring a woman, and supported their vote with sentiments such as "it is time to put a man in there," emphasized the need for a "hatchet man," and indicated that they would not vote to hire the female plaintiff, because she would require "a strong male to work under her to handle her problems . . . ." 814 F.3d at 1241. In that case, it

was clear that there was a genuine dispute of fact as to whether gender bias pervaded the decision-making process. Here, conversely, the comments are not so directly linked to the decision to fire Ms. Breeding, nor sufficiently sexual in nature, that they indicate a discriminatory termination process.

Mr. Sockel's remark about why Ms. Breeding was still working despite her husband's income is the piece of evidence that comes closest to establishing a dispute of fact that Mr. Sockel acted with gender-based animus. It fails, however, to raise a reasonable inference that IBH "actually relied on [Breeding's] gender in making its decision" to terminate her. *See Price Waterhouse*, 490 U.S. at 251. In other words, Ms. Breeding has failed to connect this remark to IBH's decision-making process, rendering it a stray remark.

If this comment was coupled with other, more probative pieces of evidence, perhaps a reasonable jury could conclude that sex motivated Breeding's termination. When viewing the record as a whole, however, the comments and remarks are not sufficient to convince a reasonable jury that sex had any bearing on the termination. This is especially true when considering that Ms. Breeding's sales assignments were given to another woman, that she was designated for termination alongside both a woman and a man, and that Mr. Sockel's sales team (after terminating Ms. Breeding) was comprised of three women and two men.

### B

In addition to relying on these remarks, Ms. Breeding also relies on Mr. Sockel's allegedly discriminatory actions to prove gender bias. These actions include: sales opportunities being directed away from her; a reduction of her responsibilities; and IBH's failure to follow its discipline Performance Improvement Process with her.

Ms. Breeding argues that Mr. Sockel directed "sales opportunities away from Ms. Breeding and to [Ms.] Pinkerton." This does not indicate sex-based discrimination for two reasons. First, Ms. Pinkerton was a better performing salesperson than Ms. Breeding, and the direction of sales opportunities to the better-performing salesperson does not run afoul Title VII. Second, Ms. Pinkerton is also a woman, which undermines the argument that sex motivated the re-direction of sales opportunities.

Ms. Breeding also points to Mr. Sockel's decision to reduce her responsibilities, which made it more difficult for her to meet her sale's goal. This also fails to show sex-based animus towards Ms. Breeding—it is reasonable that Mr. Sockel would reduce the sales opportunities of the lesser-performing salesperson. And Ms. Breeding's argument that this may be a "pretext to conceal Mr. Sockel's true motivation" is largely speculative because Mr. Sockel's sales team continued to be comprised of three women and two men. As noted, two of the four individuals with "farmer" responsibilities (Mr. Thomas and Mr. Bosche) were male.

Ms. Breeding finally argues that IBH's alleged failure to follow its "Performance Improvement Process" serves as evidence of pretext.  But that is only true where sex motivates an employer's decision to forego that internal process.  *See Mitchell v. USBI Co.*, 186 F.3d 1352, 1355-56 (11th Cir. 1999) ("Standing alone, deviation from a company policy does not demonstrate discriminatory animus.").  Mr. Sockel noted that he did not bother to employ the process because Ms. Breeding was a "long-term sales folk[ ] who [has] not achieved in the past 6+ months and [is] unlikely to change trajector[y]."  Moreover, because the reason for her termination was the reduction-in-force mandate, placing Ms. Breeding on a performance improvement plan would have been counter to the company's goal of reducing its workforce.

Construing the evidence in the light most favorable to Ms. Breeding, there is no dispute of material fact that the termination of Ms. Breeding was motivated by bias against her sex.

## VI

We affirm the district court's order granting summary judgment in favor of IBH.

**AFFIRMED.**